[No. A108599. First Dist., Div. Two. Dec. 12, 2005.]

STANLEY MacISAAC, Plaintiff and Appellant, v.
WASTE MANAGEMENT COLLECTION AND RECYCLING, INC.,
Defendant and Respondent.

**COUNSEL**

Kelly Jackson Christianson & Smith, Heather Bussing Smith and Philip H. Kelly for Plaintiff and Appellant.

Littler Mendelson, Ronald John Holland, Barbara M. Russell and Gabriel S. Levine for Defendant and Respondent.

**OPINION**

**KLINE, P. J.**—The California Worker Adjustment and Retraining Notification Act (the California WARN Act) (Lab. Code, § 1400 et seq.)[1] forbids an employer from ordering a "mass layoff" unless the employer gives 60 days' notice to the employees affected by the order and to various government entities. (§ 1401, subd. (a).) This appeal requires us to determine whether

---

[1] All statutory references are to the Labor Code.

there has been a "mass layoff" within the meaning of the California WARN Act where employees are transferred from one employer to another for whom they perform the same work at the same rates of pay and with whom they retain the same benefits. We conclude, as did the trial court, that under the facts of this case, there was no "mass layoff" triggering the notice requirements of the California WARN Act. We will therefore affirm the trial court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Waste Management Collection and Recycling, Inc., doing business as Empire Waste Management, Inc. (Empire Waste), is a company that provides refuse collection, disposal, and recycling services. Prior to February 1, 2003, Empire Waste had a contract to provide these services to the City of Santa Rosa (the City) through December 31, 2006. In 2002, the City announced its intent to accept bids for a contract to provide these services to the City after December 31, 2006. Empire Waste and several other garbage companies submitted bids to the City to perform the post-2006 work. In September 2002, the City awarded the post-2006 contract to North Bay Disposal Corporation (North Bay).

After the City awarded the post-2006 contract to North Bay, North Bay offered to purchase the remaining years of Empire Waste's contract with the City. Empire Waste agreed to sell, and the companies negotiated the terms of the sale in late 2002 and early 2003. As part of the purchase agreement, North Bay agreed to buy equipment, including trucks, from Empire Waste. The agreement also provided that Empire Waste would transfer to North Bay 41 garbage truck drivers whose routes covered the City. North Bay, in turn, agreed to hire these drivers to drive the same routes in the City that they had covered for Empire Waste, using the same equipment, working the same Monday through Friday schedule, at the same pay and date of hire for seniority and benefits purposes, and with benefits equivalent to those they received from Empire Waste. To provide support services necessary to the contract with the City, North Bay also agreed to offer a mechanic employed by Empire Waste an equivalent position at North Bay. Thus, under the terms of the purchase agreement, a total of 42 Empire Waste employees would be transferred to North Bay. We will refer to these individuals as the "Transferred Employees."

The sale transaction could not be effective until it was approved by the City. Empire Waste and North Bay expected to receive the City's approval on or before February 1, 2003, and the parties agreed to make the sale effective on that date. Empire Waste and North Bay wished to close their transaction as soon as possible after they obtained the City's approval so that they could

ensure a smooth transition. The February 1, 2003, date was also chosen to coincide with the beginning of a new billing cycle to reduce the risk of confusion for customers in the City.

On January 1, 2003, the California WARN Act took effect. (See § 1400 et seq., added by Stats. 2002, ch. 780, § 1.) One week later, on January 8, 2003, Empire Waste notified the Transferred Employees that the contract with the City was being sold to North Bay and that their jobs would be transferred to North Bay effective February 1, 2003, with the same pay and benefits. The City approved North Bay's purchase of the remainder of Empire Waste's contract a few days before February 1, 2003. Empire Waste removed the Transferred Employees from its payroll on Friday, January 31, 2003, and North Bay added the Transferred Employees to its payroll the following day.

On their next scheduled workday (Monday, February 3, 2003), 41 of the 42 Transferred Employees reported for work at North Bay's facility,[2] which is located across the street from that of Empire Waste. Beginning on that day, the Transferred Employees performed the same work for North Bay that they had performed for Empire Waste. Drivers drove the same routes in the City using the same trucks they had driven for Empire Waste, and the same mechanic serviced those trucks. In accordance with the terms of the purchase agreement, the Transferred Employees received the same pay and benefits and kept the same seniority dates at North Bay that they had had at Empire Waste. The Transferred Employees suffered no loss of pay or benefits, and none of them lost their jobs at North Bay within the first 30 days.

In February 2003, Empire Waste's parent corporation and related companies were involved in a company-wide reduction in force, which was separate and distinct from the employee transfer occasioned by the sale to North Bay. On or about February 21, 2003, Empire Waste terminated 20 employees as part of the reduction in force. None of these employees were transferred to North Bay or to any other company. Empire Waste offered the 20 employees severance benefits in exchange for a general release of claims, including claims under the California WARN Act.

On June 26, 2003, MacIsaac filed an action in Sonoma County Superior Court against Empire Waste.[3] In that action, MacIsaac claimed that Empire

---

[2] One of the Transferred Employees, plaintiff Stanley MacIsaac, received an offer of employment from North Bay, but declined to accept it. Empire Waste had no knowledge that MacIsaac had refused North Bay's offer of employment.

[3] MacIsaac filed the action on his own behalf and as representative of other similarly situated employees. (See § 1404 [permitting "[a] person . . . seeking to establish liability against an employer" to bring a civil action "on behalf of the person, other persons similarly situated, or both, in any court of competent jurisdiction"].)

Waste had violated section 1401, subdivision (a), by failing to give the Transferred Employees and the employees who were part of the reduction in force 60 days' notice of what MacIsaac termed their "layoff." After Empire Waste answered the complaint, the parties informed the court that they would be filing cross-motions for summary judgment. They agreed to stipulate to the material facts and further agreed that the case involved "a pure issue of law"—the interpretation of the California WARN Act.

Both parties moved for summary judgment, and the trial court held an oral hearing on the cross-motions. In a written order, the trial court granted Empire Waste's motion for summary judgment and denied MacIsaac's motion. The trial court found that the plaintiffs "were not separated from their positions for lack of funds or lack of work within the meaning of Cal-WARN. Therefore, the Drivers were not laid off within the language of the statute, and there was no mass layoff triggering Cal-WARN's notice requirements." The trial court accordingly entered judgment in favor of Empire Waste, and MacIsaac noted a timely appeal.

## Discussion

This appeal presents questions of statutory interpretation that are of first impression in California. We have found no California case construing the terms of the California WARN Act.[4] Legal commentary and other secondary authority on the statute are also in short supply. (See Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2004) ¶¶ 6:770 to 6:855, pp. 6-78 to 6-84 (hereafter Chin) [general discussion of statute]; Emanuel & Besch, *California's Worker Adjustment and Retraining Notification Act* (Sept. 2003) 26 L.A. Lawyer 21 (hereafter Emanuel & Besch) [comparing statute to its federal counterpart and noting numerous unresolved issues of statutory interpretation].) We therefore confront the task before us with little assistance from judicial precedent or scholarly writings. Despite this absence of authority, our inquiry is guided by well-established legal principles governing our standard of review and the interpretation of statutes. We will set out these governing principles before turning to the issues in this case.

### A. Standard of Review

MacIsaac appeals from a trial court order denying his motion for summary judgment and granting summary judgment to Empire Waste. On appeal, the

---

[4] In an unreported opinion, the United States District Court for the Northern District of California denied a defendant's motion for summary judgment on a California WARN Act claim, holding that although the defendant had never been plaintiff's "employer" for the purposes of the statute, the defendant might nevertheless be held liable on a theory of successor liability. (*McCaffrey v. Brobeck, Phleger & Harrison, L.L.P.* (N.D.Cal. Feb. 17, 2004) 2004 WL 345231, at *4–5.) That case does not assist us in our analysis here.

trial court's order is subject to de novo review, because the parties have stipulated to the relevant facts and the issues before us are questions of statutory interpretation. (See *Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 531 [85 Cal.Rptr.2d 257, 976 P.2d 808] [appellate court exercises de novo review of ruling on summary judgment motion and underlying statutory construction issues]; *City of Saratoga v. Hinz* (2004) 115 Cal.App.4th 1202, 1212 [9 Cal.Rptr.3d 791] ["the interpretation of a statute and the application of that statute to undisputed facts . . . is subject to this court's independent or de novo review"]; see also *International Alliance of Theatrical Stage Employees, etc. v. Laughon* (2004) 118 Cal.App.4th 1380, 1387 [14 Cal.Rptr.3d 341] [interpretation and application of statutes is a matter of independent review].)

## B. *The Three-step Process of Statutory Interpretation*

 In interpreting the statutory language at issue, "[w]e begin with the fundamental rule that our primary task is to determine the lawmakers' intent." (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934] (*Delaney*).) The process of interpreting the statute to ascertain that intent may involve up to three steps. (*Californians Against Waste v. Department of Conservation* (2002) 104 Cal.App.4th 317, 321 [127 Cal.Rptr.2d 905], citing *Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233 [8 Cal.Rptr.2d 298] (*Halbert's Lumber*); see *Mejia v. Reed* (2003) 31 Cal.4th 657, 663 [3 Cal.Rptr.3d 390, 74 P.3d 166].) As other courts have noted, the key to statutory interpretation is applying the rules of statutory construction in their proper sequence. (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 122 [41 Cal.Rptr.2d 295]; *Halbert's Lumber, supra,* 6 Cal.App.4th at p. 1238.) We have explained this three-step sequence as follows: "we first look to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction." (*Riverview Fire Protection Dist. v. Workers' Comp. Appeals Bd.* (1994) 23 Cal.App.4th 1120, 1126 [28 Cal.Rptr.2d 601] (*Riverview Fire Protection Dist.*).)

### 1. *The First Step: The Language of the Statute Itself*

In the first step of the interpretive process we look to the words of the statute themselves. (*Delaney, supra,* 50 Cal.3d at p. 798; accord, *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 60 [53 Cal.Rptr.2d 741] ["primary determinant" of legislative intent is words used by the Legislature].) The Legislature's chosen language is the most reliable indicator of its intent because " 'it is the language of the statute itself that has successfully braved the legislative gauntlet.' " (*California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 338 [33 Cal.Rptr.2d 109, 878 P.2d

1321] (*California School Employees Assn.*), quoting *Halbert's Lumber, supra,* 6 Cal.App.4th at p. 1238.) We give the words of the statute "a plain and commonsense meaning" unless the statute specifically defines the words to give them a special meaning. (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 577 [110 Cal.Rptr.2d 809, 28 P.3d 860] (*Flannery*); *Halbert's Lumber, supra,* 6 Cal.App.4th at p. 1238.) If the statutory language is clear and unambiguous, our task is at an end, for there is no need for judicial construction. (*California School Employees Assn., supra,* 8 Cal.4th at p. 340; *Delaney, supra,* 50 Cal.3d at p. 798.) In such a case, there is nothing for the court to interpret or construe. (*Halbert's Lumber, supra,* 6 Cal.App.4th at p. 1239.)

Nevertheless, the "plain meaning" rule does not prevent a court from determining whether the literal meaning of the statute comports with its purpose. (*California School Employees Assn., supra,* 8 Cal.4th at p. 340; *Katz v. Los Gatos-Saratoga Joint Union High School Dist.* (2004) 117 Cal.App.4th 47, 54 [11 Cal.Rptr.3d 546] (*Katz*).) Thus, although the words used by the Legislature are the most useful guide to its intent, we do not view the language of the statute in isolation. (*Flannery, supra,* 26 Cal.4th at p. 578.) Rather, we construe the words of the statute in context, keeping in mind the statutory purpose. (*Delaney, supra,* 50 Cal.3d at p. 798.) We will not follow the plain meaning of the statute "when to do so would 'frustrate[] the manifest purposes of the legislation as a whole or [lead] to absurd results.' " (*California School Employees Assn., supra,* 8 Cal.4th at p. 340, quoting *People v. Belleci* (1979) 24 Cal.3d 879, 884 [157 Cal.Rptr. 503, 598 P.2d 473].) Instead, we will " 'interpret legislation reasonably and . . . attempt to give effect to the apparent purpose of the statute.' " (*American Tobacco Co. v. Superior Court* (1989) 208 Cal.App.3d 480, 490 [255 Cal.Rptr. 280] (*American Tobacco*), quoting *Zidell v. Bright* (1968) 264 Cal.App.2d 867, 869 [71 Cal.Rptr. 111].)

> 2. *The Second Step: Canons of Construction and Extrinsic Aids to Interpretation*

When the plain meaning of the statute's text does not resolve the interpretive question, we must proceed to the second step of the inquiry. (*Katz, supra,* 117 Cal.App.4th at p. 55; *Halbert's Lumber, supra,* 6 Cal.App.4th at p. 1239.) In this second step, "the courts may turn to rules or maxims of construction 'which serve as aids in the sense that they express familiar insights about conventional language usage.' " (*Mejia v. Reed, supra,* 31 Cal.4th at p. 663, quoting 2A Singer, Statutes and Statutory Construction (6th ed. 2000) § 45:13, p. 107.) We may also look to a number of extrinsic aids,[5] including the statute's legislative history, to assist us in our interpretation. (*Flannery,*

---

[5] "Extrinsic aids" to statutory construction are sources outside of the statutory text itself. (2A Singer, Statutes and Statutory Construction, *supra,* § 48:01, p. 407.) In addition to the

*supra*, 26 Cal.4th at p. 579; *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323] (*Dyna-Med*); *Williams v. Superior Court* (2001) 92 Cal.App.4th 612, 621 [111 Cal.Rptr.2d 918].)

### 3. *The Third Step: "Reason, Practicality, and Common Sense"*

If ambiguity remains after resort to secondary rules of construction and to the statute's legislative history, then we must cautiously take the third and final step in the interpretive process. (*Katz, supra,* 117 Cal.App.4th at p. 55.) In this phase of the process, we apply "reason, practicality, and common sense to the language at hand." (*Halbert's Lumber, supra,* 6 Cal.App.4th at p. 1239.) Where an uncertainty exists, we must consider the consequences that will flow from a particular interpretation. (*Dyna-Med, supra,* 43 Cal.3d at p. 1387.) Thus, "[i]n determining what the Legislature intended we are bound to consider not only the words used, but also other matters, 'such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy and contemporaneous construction.' [Citation.]" (*American Tobacco, supra,* 208 Cal.App.3d at p. 486, quoting *Estate of Jacobs* (1943) 61 Cal.App.2d 152, 155 [142 P.2d 454].) These "other matters" can serve as important guides, because our search for the statute's meaning is not merely an abstract exercise in semantics. To the contrary, courts seek to ascertain the intent of the Legislature for a reason— "to *effectuate the purpose* of the law." (*Dyna-Med, supra,* 43 Cal.3d at p. 1386, italics added; see *City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 468 [14 Cal.Rptr.2d 514, 841 P.2d 1034] [court's "objective is to ascertain and effectuate legislative intent"].)

With these principles in mind, we turn to the merits of this appeal. In this case, each of the foregoing tools leads us to conclude that the trial court correctly interpreted the language of the statute. (See *Riverview Fire Protection Dist., supra,* 23 Cal.App.4th at p. 1127.)

### C. *The Language of the California WARN Act*

As explained in the preceding section, the first step in our analysis is an examination of the language of the statute. Section 1401, subdivision (a), prohibits an "employer" from ordering a "mass layoff" at a "covered establishment"[6] unless the employer gives 60 days' written notice of the mass layoff to "(1) The employees of the covered establishment affected by the

---

legislative history of the enactment in question, such extrinsic aids may include other statutes dealing with the same subject matter. (*Id.,* § 48:01, pp. 408–410; § 51:01, p. 170.)

[6] A "covered establishment" is defined as "any industrial or commercial facility or part thereof that employs, or has employed within the preceding 12 months, 75 or more persons."

order. [¶] (2) The Employment Development Department, the local workforce investment board, and the chief elected official of each city and county government within which the termination, relocation, or mass layoff occurs." (§ 1401, subd. (a).) The parties dispute whether Empire Waste's actions constitute a "mass layoff" that triggers the notice requirements of the statute. We must therefore examine the language the Legislature used to define the relevant terms.

In section 1400, the Legislature set out the definition of a number of key terms used in the California WARN Act. Of particular relevance here is section 1400, subdivision (d), which defines "mass layoff." Under that provision, a "mass layoff" is "a layoff during any 30-day period of 50 or more employees at a covered establishment." (§ 1400, subd. (d).) The word "layoff," in turn, is defined in the immediately preceding subdivision as "a separation from a position for lack of funds or lack of work." (§ 1400, subd. (c).) Thus, the plain language of the relevant provisions of sections 1400 and 1401 indicates that the notice obligation is triggered for employers operating covered establishments when 50 or more employees are "separated from their positions" within a 30-day period.

Empire Waste contends that there was no "mass layoff" triggering the notification requirements of section 1401, subdivision (a), because there was no "layoff" of 50 or more employees. Empire Waste concedes that it laid off 20 employees as part of a company-wide reduction in force on February 21, 2003.[7] But Empire Waste argues that, because the Transferred Employees continued to work in the same positions after the sale of the contract to North Bay, they were not "separat[ed] from [their] positions for lack of work or lack of funds." According to Empire Waste, the total number of its employees who experienced a "layoff" is 20, because the 42 Transferred Employees were not separated from their positions and therefore cannot be counted towards the total. In Empire Waste's view, it had no obligation to give notice under the California WARN Act because the number of layoffs simply did not meet the statutory threshold of 50 employees.

MacIsaac argues that the statute is unambiguous. He contends that the 50-employee threshold of the statute was met because the 42 Transferred Employees, when added to the 20 who were admittedly laid off, total more than 50 employees. MacIsaac asserts that, under the plain language of the California WARN Act, the Transferred Employees were subject to a "layoff" within the meaning of the statute because they no longer worked *for Empire*

---

(§ 1400, subd. (a).) The parties have stipulated that Empire Waste is an "employer" and that it operated a "covered establishment" for the purposes of the California WARN Act.

[7] The parties agree that the relevant 30-day period is January 31, 2003, through March 2, 2003.

*Waste* after January 31, 2003. In MacIsaac's reading of the statute, "[l]aid-off means no longer working *at the employer's place of work. . . .*" MacIsaac summarizes his argument as follows: "Whether the [Transferred Employees] went on to work for North Bay or someone else does not matter under the language of Cal-WARN. And Empire Waste's 'seamless transition' is completely irrelevant for the court's analysis of whether Empire Waste was required to give notice under Cal-WARN. Cal-WARN is a *notice* statute. The only question is whether the conditions for notice existed at the time Empire Waste was required to give notice. What happened afterward has nothing to do with this case." As is apparent from the language we have just quoted, under MacIsaac's reading of the statute, a "layoff" occurs when the employee is separated from the payroll of a particular employer.

It is evident that this case turns on the definition of the term "layoff" in the statute, and we find that definition unambiguous. (See *People v. Bostick* (1996) 46 Cal.App.4th 287, 295 [53 Cal.Rptr.2d 760] (conc. opn. of Kline, P. J.) [no facial ambiguity in statute unless terms are capable of being construed in two different ways by reasonably well-informed people].) The statute defines "layoff" as "a separation *from a position* for lack of funds or lack of work." (§ 1400, subd. (c), italics added.) In contrast to the plain language of the statute, MacIsaac focuses on whether the employee was separated from a particular *employer*. But under the Legislature's express definition, that is clearly the wrong question. Under the Legislature's chosen definition of "layoff," the determining factor is whether the employee has been separated from "a position," not whether the employee is separated from an "employer." (*Ibid.*)

The Legislature might easily have chosen to define "layoff" in language that would yield MacIsaac's desired interpretation. For example, the Legislature might have defined "layoff" by reference to severance of the relationship between an employee and an "employer" rather than by reference to severance of the relationship between an employee and "a position." Or, the Legislature could have defined "layoff" by tying the term to the cessation of an employee's work at a particular "covered establishment." (Cf. § 1400, subd. (f) ["termination" defined as "the cessation or substantial cessation of industrial or commercial operations in a covered establishment"].) But the Legislature did not do so, and we are bound to apply the express definition drafted by the Legislature to the facts of this case. (See *Delaney, supra,* 50 Cal.3d at p. 804 ["It is bedrock law that if 'the law-maker gives us an express definition, we must take it as we find it . . . .' " (quoting *Bird v. Dennison* (1857) 7 Cal. 297, 307)].)

█ Under the undisputed facts of this case, it is clear that the Transferred Employees were not separated from their positions. Their positions were

shifted to North Bay when North Bay purchased the remaining years of a government contract previously held by Empire Waste. The Transferred Employees continued to serve the City under that same contract. The parties stipulated below that the Transferred Employees continued to perform the same functions at North Bay that they had performed at Empire Waste. The drivers drove the same routes, using the same trucks, which were serviced by the same mechanic. North Bay took on the Transferred Employees at the same pay, with the same benefits, and at the same level of seniority that they had had at Empire Waste. The Transferred Employees lost not even a minute of work, because they worked their last day for Empire Waste on Friday, January 31, 2003, and reported for work directly across the street at North Bay on Monday, February 3, 2003, their next scheduled work day.

In light of these facts, it is apparent that the Transferred Employees were not "separated from their positions" and there was therefore no "layoff" of the Transferred Employees within the meaning of the California WARN Act. (See § 1400, subd. (c).) Because there was no "layoff" of 50 or more employees, it follows that there was no "mass layoff" that would have required Empire Waste to give notice under the statute.[8] (§§ 1400, subd. (d), 1401, subd. (a).)

D. *Reference to Extrinsic Aids Confirms that Empire Waste Had No Obligation to Give Notice*

Although we have concluded that the unambiguous language of the statute is dispositive of this case, because the parties make arguments based upon the federal WARN Act, and the legislative history of California's statute, we will review these extrinsic aids to construction. (See *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 588–594 [94 Cal.Rptr.2d 3, 995 P.2d 139] (*Morillion*) [reviewing analogous federal labor statutes and case law despite finding that language of California wage order was unambiguous]; *Riverview Fire Protection Dist., supra,* 23 Cal.App.4th at p. 1127 [looking to legislative

---

[8] We wish to emphasize that our holding is limited to the situation before us, in which all of the Transferred Employees retained their former positions with no change in the terms of their employment. A different situation might be presented if North Bay had offered "to rehire the workers at a wage so much lower than their previous wage, or on conditions so much inferior, as to rebut an inference of continuity of employment." (*International Oil v. Uno-Ven Co.* (7th Cir. 1999) 170 F.3d 779, 784 [construing federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the federal WARN Act)]; accord, *Local 819, International Brotherhood of Teamsters v. Textile Deliveries, Inc.* (S.D.N.Y. Sept. 20, 2000) 2000 U.S. Dist. LEXIS 13441, 2000 WL 1357494, at *5–6 [under federal WARN Act, rehiring of workers "into inferior positions under unfavorable terms and conditions . . . may also lead to employment losses" where workers lose seniority, health, welfare, pension, and vacation benefits]; cf. also 20 C.F.R. §§ 639.3(f)(2), 639.5(b)(2) [under federal WARN Act transfer or reassignment of employee may constitute "employment loss" if they amount to "constructive discharge"].)

history despite unambiguous language of statute at issue].) Our review of these extrinsic aids only serves to confirm our reading of the plain language of the statute.

### 1. Comparison with the Federal WARN Act

MacIsaac seeks to avoid the import of the unambiguous statutory language by contrasting California's statute with the federal WARN Act,[9] and he asks us to draw two inferences from a comparison of the two statutes.[10] First, he correctly notes that under the federal statute the notice requirement is triggered only by an actual "employment loss." (29 U.S.C. §§ 2101(a)(3)(B), 2102(a).) MacIsaac argues that because the Legislature referred to the federal WARN Act in the California statute (see § 1401, subd. (b)), it was aware of the federal legislation when it enacted the California WARN Act. He reasons that if the Legislature had intended to require that notice be triggered only by an actual loss of employment, then it would have followed the federal statute and said so explicitly. In MacIsaac's view, the Legislature's omission of an explicit requirement of "employment loss" is an indication that it did not intend to import that provision into the California WARN Act. (See, e.g., *J.R. Norton Co. v. General Teamsters, Warehousemen & Helpers Union* (1989) 208 Cal.App.3d 430, 442 [256 Cal.Rptr. 246] [omission of provision in federal labor statute that provided model for Legislature indicates that Legislature did not intend to import such provision into the state statute].)

This argument misses the mark, because it fails to account for differences in the language of the two statutory schemes. (Cf. *Morillion, supra,* 22 Cal.4th at p. 588 [advising caution when comparing different state and federal statutory regimes].) The federal WARN Act ties the notice requirement to a "mass layoff," which is defined as an "employment loss at [a] single site of employment." (29 U.S.C. § 2101(a)(3)(B).) Contrary to MacIsaac's interpretation, the California statute *does* make the notice requirement dependent upon "employment loss"; it simply uses very different language to do so. The California WARN Act requires that employees be "separat[ed] from a position" before a "mass layoff" triggering the notice requirement will be deemed

---

[9] Under the federal statute, an "employer" may not order a "mass layoff" unless 60 days' notice is given to "affected employees." (29 U.S.C. § 2102(a).) Congress defined "mass layoff" as a reduction in force that results in an "employment loss" at a single site of employment for either (a) at least 33 percent of the workforce and 50 employees or (b) at least 500 employees. (29 U.S.C. § 2101(a)(3)(B).) Thus, under the federal WARN Act, there can be no "mass layoff" (and therefore no requirement to give notice) unless the specified number of employees experience an actual "employment loss."

[10] We note that MacIsaac appears to make these arguments in response to Empire Waste's reliance on federal authority in the court below. MacIsaac's primary argument, which we have rejected, is that the plain language of the California WARN Act compels his interpretation and that reference to the federal WARN Act is therefore unnecessary.

to have occurred. (See §§ 1400, subds. (c) & (d), 1401, subd. (a).) Viewed in this fashion, it becomes evident that the Legislature did not need to state specifically that notice was required only in instances of employment loss, because the requirement of an employment loss (separation from a position) was built into the definition of "layoff" and "mass layoff." Given the differences in the terms chosen by Congress and our Legislature, we will not draw any inference from what MacIsaac views as the omission of an explicit requirement that notice under the California WARN Act be conditioned on "employment loss." (Cf. *State v. T.J. International, Inc.* (Wis. 2001) 244 Wis.2d 481 [628 N.W.2d 774, 780–781] [differences between definitions used in Wisconsin WARN Act and federal WARN Act made reference to federal authority unhelpful].)

MacIsaac asks us to draw a second inference from the differences in the language of the federal and California WARN Acts. He argues that the federal statute, unlike California's, contains an explicit "sales exception" that exempts "a sale of part or all of an employer's business" from the definition of "employment loss." (See 29 U.S.C. § 2101(b).) MacIsaac reasons that if the Legislature had wished to exempt the sale of a business from the notice requirements of the California WARN Act, it could have included an explicit exception similar to the one used in the federal statute. Here again, MacIsaac focuses too much on what the California WARN Act does not say and too little on what it does say. Under our reading of the statute, this "omission" is irrelevant under the facts of this case. Here, none of the Transferred Employees were separated from their positions, which were simply moved to North Bay when it purchased the contract. No sales exception is necessary where employees retain their "positions" and simply go to work for another employer, because the requirements of the California WARN Act do not apply in the first instance.[11]

---

[11] MacIsaac also relies on statements in the California Practice Guide on Employment Litigation that the California WARN Act requires notice in situations in which there is no employment loss. (See Chin, *supra,* ¶ 6:800 at p. 6-81 [notice requirement for a "relocation" under § 1400, subd. (e)]; *id.,* ¶ 6:810 at p. 6-81 [notice requirement for "termination" under § 1400, subd. (f)].) After observing that the statute's notice requirement for a "termination" is not conditioned on employment loss, Justice Chin and his co-authors do state that "[t]herefore, *presumably,* statutory notice is required even where a going business is sold to a new owner who retains all the existing employees." (Chin, *supra,* ¶ 6:810 at p. 6-81, italics added.) We note that this statement is made in connection with a "termination" under the California WARN Act (a situation not at issue here), and the Practice Guide makes no similar statement with respect to layoffs or mass layoffs. Thus, the statement provides no direct support for MacIsaac's interpretation of the statute. In addition, the use of the word "presumably" indicates the very tentative nature of the authors' conclusion. Other commentators view it as "unclear" whether a "mass layoff" occurs "if 50 or more employees experience a separation from the seller's payroll" but continue in employment with the buyer. (See Emanuel & Besch, *supra,* 26 L.A. Lawyer at p. 25.)

## 2. *The Legislative History of the California WARN Act*

The parties have not pointed to anything in the legislative history of the California WARN Act that further explains the meaning of the term "layoff." Nevertheless, the legislative history that does exist supports our conclusion that the Legislature did not intend to require notice in the circumstances of this case. In considering the California WARN Act, the Legislature expressed concern that the thresholds set by the federal WARN Act meant that employers did not have to give notice of "substantial layoffs that may have major impacts on small communities." (See Assem. Com. on Judiciary, Analysis of Assem. Bill No. 2957 (2001–2002 Reg. Sess.) April 16, 2002, p. 2.) As an Assembly analysis of the bill noted, "a lay off of 400 employees in a small or medium sized community may have a dramatic impact, but would not be covered by the federal act." (*Ibid.*; see also Assem. Com. on Appropriations, Analysis of Assem. Bill No. 2957 (2001–2002 Reg. Sess.) April 24, 2002, p. 2 [same]; Sen. Com. on Industrial Relations, Analysis of Assem. Bill No. 2957 (2001–2002 Reg. Sess.) June 26, 2002, p. 2 ["The concern over [federal] WARN is there can be a mass layoff of 499 or fewer with no notice to the community because the employees laid off do not constitute a third of the workforce"].)

As a consequence, the legislation was intended to "supplement[] the federal plant closure law, by requiring notification of layoffs, terminations, and relocations, which affect 499 or fewer employees." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2957 (2001–2002 Reg. Sess.) as amended Aug. 26, 2002, p. 1.) The arguments offered in support of the legislation noted that it would "give communities a chance to prepare for the impact of large layoffs which do not trigger notification under the [federal] WARN Act." (*Id.* at p. 4.) The notice requirement was intended to address three concerns. First, the notice required by the proposed legislation would place local governments and other concerned entities "in a better position to retrain and offer placement services to those affected." (*Ibid.*) Second, the notice would "give affected employees the greater ability to make plans and adjustments to their new situation as well as seek other employment and educational opportunities." (*Ibid.*) Third, notice would also "allow for local resources to be utilized helping to ease the strain caused by a layoff or plant closure on the community." (*Ibid.*)

Here, it is apparent that none of the three concerns that actuated the Legislature are implicated. Because the Transferred Employees have retained their positions, albeit with a different employer, the City does not need to "retrain and offer placement services to those affected." Nor do the Transferred Employees need to "seek other employment and educational opportunities," because they remain employed, performing the same jobs at

the same rates of pay and with the same level of benefits. Thus, in the circumstances of this case, there is no need for "local resources to be utilized . . . to ease the strain caused by a layoff or plant closure on the community." Interpreting the statute to require notice in this case therefore would in no way "effectuate the purpose of the law" as expressed in the legislative history. (*Dyna-Med, supra,* 43 Cal.3d at p. 1386.)

E. *"Reason, Practicality, and Common Sense" Support the Conclusion that Empire Waste Was Not Obligated to Give Notice*

Our examination of the statutory language and legislative history more than suffice to support our holding that there was no "mass layoff" which would have triggered the notice requirement in this case. Nevertheless, we note that the result we reach here is in accord with "reason, practicality, and common sense." (*Halbert's Lumber, supra,* 6 Cal.App.4th at p. 1239.) Were we to agree with MacIsaac, the liability provisions of the statute would require that the Transferred Employees receive "back pay" "for the period of the employer's violation, up to a maximum of 60 days, or one-half the number of days that the employee was employed by the employer, whichever period is smaller." (§ 1402, subds. (a)(1) & (b).) And because the Transferred Employees remained fully employed after their transfer to North Bay, accepting MacIsaac's reading of the statute would grant the Transferred Employees a period of double pay, for they would receive "back pay" damages for days on which they were, in fact, employed and for which they were paid.

In short, adopting MacIsaac's interpretation of the statute would require us to impute to the Legislature the intent to require employers to give "back pay" to employees who have suffered no loss of pay at all.[12] California courts are justifiably reluctant to construe statutes to confer a windfall. (E.g., *Flannery, supra,* 26 Cal.4th at p. 586 [rejecting construction of statute that would have allowed party that had neither paid nor incurred attorney fees to keep fee award]; *Unzueta v. Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1701 [8 Cal.Rptr.2d 614] [back pay award to suspended teacher who was later reinstated must be reduced by amount teacher earned during period of suspension; back pay is designed to "make the employee whole," not to confer a windfall].) We will not adopt a reading of the statute that would lead

---

[12] Justice Stephen Breyer has suggested that when a statute itself does not answer the interpretive question, judges may "ask instead how a (hypothetical) reasonable member of Congress, given the statutory language, structure, history, and purpose, *would have* answered the question, had it been presented." (Breyer, *Our Democratic Constitution* (2002) 77 N.Y.U. L.Rev. 245, 266.) Had the question been presented to the members of the Legislature, we do not believe that they would have voted to grant "back pay" to workers who lost no pay at all and who retained their prior positions, albeit with a new employer.

to such a result. (See *California School Employees Assn., supra,* 8 Cal.4th at p. 340 [courts must construe statutes "to avoid capricious results unintended by the Legislature"].)

DISPOSITION

The judgment is affirmed.

Haerle, J., and Ruvolo, J., concurred.