[No. G035795. Fourth Dist., Div. Three. Sept. 28, 2006.]

GOLDEN STATE BORING & PIPE JACKING, INC., Plaintiff and Appellant, v.
ORANGE COUNTY WATER DISTRICT, Defendant and Respondent;
COLICH CONSTRUCTION, LP, Real Party in Interest.

**COUNSEL**

Schoth, Creyaufmiller & Associates and Timothy P. Creyaufmiller for Plaintiff and Appellant.

Rutan & Tucker, Joel D. Kuperberg, John A. Ramirez and Peter J. Howell for Defendant and Respondent.

Weston, Benshoof, Rochefort, Rubalcava & MacCuish, Kevin S. Collins and Stephanie A. Jones for Real Party in Interest.

**OPINION**

**IKOLA, J.**—Colich Construction, LP (Colich), a general contractor, submitted a bid for a public works contract to construct Orange County Water District's (OCWD) Groundwater Replenishment System Unit II Pipeline Project (the project). Colich's bid listed Golden State Boring and Pipe Jacking, Inc. (GSB), as a subcontractor. After OCWD awarded the contract to Colich, GSB persistently refused to sign the subcontract requiring it to obtain a performance bond as GSB gratuitously had offered to do in its successful bid for the subcontract. The impasse led Colich to seek OCWD's approval of its request to substitute GSB out of participation in the project. After an evidentiary hearing, OCWD authorized the substitution, finding under Public Contract Code section 4107, subdivision (a)(1),[1] that GSB's unjustified intransigence constituted an "unwillingness to execute a written subcontract for the scope of work specified in its sub-bid." GSB's petition for writ in mandamus proceedings (Code Civ. Proc., § 1094.5) was denied by the superior court.

On appeal, GSB argues Colich had no right to insist on a performance bond because Colich failed to make a statutory request for bond under section 4108. We conclude the superior court did not err in rejecting GSB's argument and finding the bond was a condition GSB imposed upon itself as part of the consideration for Colich's acceptance of its bid for the subcontract.

## FACTS

*Statutory Background*

The Subletting and Subcontracting Fair Practices Act, section 4100 et seq. (the Act), establishes a detailed mandatory framework for competitive bids on public works contracts. The Act requires general contractors to identify in their bids all subcontractors "who will perform work or labor or render service to the prime contractor" in excess of one-half of 1 percent of the total bid of the prime contract. (§ 4104, subd. (a)(1).)[2] The requirement emanates from the Legislature's finding "that the practices of bid shopping and bid peddling in connection with the construction, alteration, and repair of public improvements often result in poor quality of material and workmanship to the detriment of the public, deprive the public of the full benefits of

---

[1] All further statutory references are to the Public Contract Code unless otherwise stated.

[2] If a prime contractor fails to specify a subcontractor or specifies more than one subcontractor for the same portion of work, "the prime contractor agrees that he or she is fully qualified to perform that portion himself or herself, and that the prime contractor shall perform that portion himself or herself." (§ 4106.)

fair competition among prime contractors and subcontractors, and lead to insolvencies, loss of wages to employees, and other evils."[3] (§ 4101.)

"The Act thus binds a contractor to its listed subcontractors, even though the parties have not yet entered into a contractual relationship." (*E. F. Brady Co. v. M. H. Golden Co.* (1997) 58 Cal.App.4th 182, 189 [67 Cal.Rptr.2d 886].) It confers a statutory right on the listed subcontractor to perform the specified work. (§ 4107; *R.J. Land & Associates Construction Co. v. Kiewit-Shea* (1999) 69 Cal.App.4th 416, 421 [81 Cal.Rptr.2d 615].) "Once a subcontractor has been designated, the prime contractor cannot substitute another subcontractor unless the awarding authority consents and one of certain situations exists." (*Valley Crest Landscape, Inc. v. City Council* (1996) 41 Cal.App.4th 1432, 1438 [49 Cal.Rptr.2d 184].)

The circumstances justifying substitution are set forth in sections 4107 and 4107.5. As relevant here, grounds for substitution exist "[w]hen the subcontractor listed in the bid, after having had a reasonable opportunity to do so, fails or refuses to execute a written contract for the scope of work specified in the subcontractor's bid . . . , when that written contract, based upon the general terms, conditions, plans, and specifications for the project involved or the terms of that subcontractor's written bid, is presented to the subcontractor by the prime contractor." (§ 4107, subd. (a)(1).)

When notified of the prime contractor's request for substitution, the subcontractor may submit written objections to the awarding agency and obtain an administrative hearing. (§ 4107, subd. (a).) Thereafter, "a subcontractor that believes an awarding authority has violated the Act's statutory mandate may be entitled to bring an administrative mandamus under Code of Civil Procedure section 1094.5." (*E. F. Brady Co. v. M. H. Golden Co., supra,* 58 Cal.App.4th at p. 192, fn. 8.)

*The Bid and the Parties' Negotiations*

In August 2003, OCWD issued a notice inviting bids for construction of a years-long, wide-ranging, multimillion dollar project designed to assist the district's groundwater replenishment operations for recharging OCWD's groundwater basin. Bids were due by 1:00 p.m. on October 21, 2003. Colich, the bidding prime contractor, neither advertised for subcontract bids (subbids)

---

[3] "Bid shopping is the use of the low bid already received by the general contractor to pressure other subcontractors into submitting even lower bids. Bid peddling, conversely, is an attempt by a subcontractor to undercut known bids already submitted to the general contractor in order to procure the job. [Citations.] The statute is designed to prevent only bid shopping and peddling that takes place after the award of the prime contract." (*Southern Cal. Acoustics Co. v. C. V. Holder, Inc.* (1969) 71 Cal.2d 719, 726, fn. 7 [79 Cal.Rptr. 319, 456 P.2d 975].)

nor issued any written invitations for bids. The parties agree Colich informally requested bids for subcontracts. On the final day for bidding on the prime contract, just a few minutes before the deadline, GSB faxed to Colich the low bid for subcontracting about $3 million of tunneling and grout work. The proposal stated, inter alia, "If bond is required, a fee of 2.5% of the contract price will be added." Colich promptly submitted its $16 million prime bid, listing GSB as a subcontractor.

GSB's unilateral offer to obtain bonding was to take center stage as the parties further negotiated the terms of the subcontract. For instance, when GSB twice faxed to Colich revised proposals inserting terms omitted from the initial subbid, it reiterated its offer to provide a bond if required, and with the second fax transmission, GSB further memorialized the proposal under a formal heading labeled "Bonds," setting forth the matter in standardized format, as follows: "The cost of a bond premium is not included in the contract price. If desired by and paid by others, *GSB* will furnish a Payment and Performance bond at *2.5%* of the contract value." (Italics indicate filled-in blanks.) Thus, all of GSB's subbid negotiations referred to the bonding offer.

OCWD awarded Colich the prime contract, and in January 2004, Colich sent GSB a letter of intent advising GSB it had been selected and a subcontract would soon follow. Thereafter, apparently concerned with GSB's performance on another project, Colich asked the subcontractor to sign a written "statement of understanding" "agree[ing] to bare [*sic*] responsibility for your contractual obligations and the potential delays and damages caused by [GSB]." The statement of understanding recited that GSB agreed to reimburse Colich for any delay costs or damages pertaining to the project, and warned that if GSB failed to do so, Colich would "diligently pursue contractor substitution on this basis." GSB executed the statement of understanding.

In mid-March 2004, Colich sent GSB the subcontract agreement containing, inter alia, a verbatim provision for the bonding as proposed by GSB in its subbid, to wit, "If bond is required, a fee of 2.5% of the contract price will be added." In early April 2004, Colich orally asked GSB to submit a bond on the project. In response, GSB's president, Jeffrey Johnson, wrote: "[We] will make every effort to provide the requested bond. Before a bond can be obtained, the bonding agent is requiring updated financial statements. [GSB's] accountant is aware of the project and will complete the financials as soon as possible. [¶] Colich Construction has waited over 5 months to request a bond. Colich Construction and Colich & Sons have never asked for a bond in the last 10 years the company owners have done business. [¶] Per the proposal, the bond will be 2.5% of the contract total. The amount to be made

payable to [GSB] upon issuance of bond. If you have any further questions, please feel free to contact our office."

That letter was contradicted two days later by GSB's attorney, who wrote of GSB's position that Colich had waived any right to demand a bond, to wit: "At this time I have been informed by [GSB] that your firm is requiring [GSB] to submit a performance and a payment bond on the subject matter contract, which requirement [GSB] contends, was just recently made after [GSB] had already provided submittals pursuant to your request. [¶] It is [GSB's] position that it is not required to provide a bond on this project since [Colich] failed to clearly specify the amount and requirement of the bond in its written and/or published request for subbids on the subject matter project. Pursuant to *Public Contract Codes Section 4108(c)*, if your firm fails to make such demand, your firm is precluded from imposing any bond requirements upon [GSB]."

As discussed more fully, *post*, the statute to which GSB's attorney alluded, section 4108, subdivision (c)(3), precludes a prime contractor from imposing bond requirements where it has failed "to specify bond requirements, in accordance with this subdivision, in the written or published request for subbids." Here, it is undisputed Colich never issued a written or published request for subbids. It simply considered subcontractors' responses to an informal invitation for subbids and chose the lowest bid, which was submitted by GSB only minutes before Colich's deadline to submit its project bid to OCWD.

Responding to the letter from GSB's attorney, on April 16, 2004, Colich advised GSB it disagreed with GSB's "intended use and interpretation of" section 4108, subdivision (c): The statute was inapt because Colich had never issued a written or published request for subbids. Rather, GSB itself had gratuitously stated its ability and readiness to provide bonds at a specified rate—a condition that Colich asserted "was certainly a factor that was looked at and considered when Colich evaluated the proposals for this work." Colich reiterated it was simply asking GSB to obtain bonds at Colich's expense, just as GSB had proposed in its subbid. Colich further urged GSB to respond promptly, and it cautioned, "If there is a problem with the subcontract agreement, we must be notified immediately so that we can either attempt to remedy the problem or seek subcontractor substitution."

The parties then exchanged more letters and revised subcontracts, but each held its ground on the bonding requirement. Finally, in May 2004, GSB rejected the most recent subcontract put forward by Colich, noting, "[W]e are aware of each other's position [regarding the bond issue] and are at an impasse."

*The Administrative Proceedings and Superior Court Review Regarding Substitution*

The bonding controversy resulted in Colich's request to OCWD, pursuant to section 4107, subdivision (a)(1), "to substitute its listed tunneling subcontractor, [GSB], on the grounds that [GSB] has refused to execute a contract for the performance of the work in accordance with the terms of its sub-bid to Colich for the Project." Colich argued that "[b]ecause [GSB] promised in its sub-bid to provide bonds, its refusal now to honor that commitment is grounds for substitution under the above-referenced provision of the Public Contract Code. To be clear, the bonding requirement is *not* one that Colich imposed unilaterally. Rather, Colich merely seeks to accept [GSB's] sub-bid in accordance with the terms set out by [GSB]."

GSB urged OCWD to deny the substitution request. It contended Colich had failed to comply with the prime contractor's duties under section 4108, subdivision (c), regarding a demand for bonding. It argued, inter alia, that GSB could not provide a bond "even if it wanted to because of the necessary lead time and the current bonding capacity which became more limited within the recent months," and it explained that a dispute with Colich on another project "has made [it] even more difficult for [GSB] to obtain a bond in such a short time span."

The matter was heard in July 2004. The next month, OCWD issued its statement of decision approving Colich's substitution request. In pertinent part, that decision states: "The underlying question is whether Colich was *'imposing'* the bond requirement as prescribed in [section] 4108. In its original sub-bid to Colich, [GSB] included the following statement regarding [GSB's] provision of bonds: 'If bond is required, a fee of 2.5% of the contract price will be added.' In this case, there is no evidence that Colich published or otherwise transmitted a written request for sub-bids; rather, [GSB] sent its sub-bid to Colich without a formal solicitation. It is not unusual on public works projects that a general contractor rely on such information contained in a sub-bid in making a determination as to which subcontractor to list in the bid submitted to the public agency. [GSB's] representation that it would provide a bond, and [GSB's] subsequent pieces of correspondence to Colich stating that [GSB] was making an effort to provide the bonds, make it apparent that the bond was not being required by Colich, but instead was part of the consideration offered by [GSB] and accepted by Colich; as a result, Section 4108 does not apply. [¶] [GSB's] unwillingness to execute a written subcontract for the scope of work specified in its sub-bid submitted to Colich is reason for [OCWD] consenting to Colich's requested substitution under [section] 4107[, subdivision] (a)(1)." Based on these findings, OCWD authorized Colich to substitute Pacific Boring, Inc., as the tunneling subcontractor for the project.

The superior court denied GSB's petition for a writ of mandate seeking to overturn OCWD's decision. Specifically, it found OCWD's decision supported by substantial evidence, i.e., GSB unilaterally offered to provide a bond, and Colich did not issue a written or published request for subbids. Thus, section 4108 was inapplicable, and Colich's failure to request a bond under that statute did not preclude it from accepting GSB's offer to provide a bond. GSB appeals from judgment entered in favor of OCWD and Colich.

## DISCUSSION

### Standard of Review

The parties argue about the appropriate standard of review. Colich and OCWD contend that if the public agency's findings are supported by substantial evidence in the administrative record, those findings are binding on us, as they were on the trial court. (*Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 334–335 [25 Cal.Rptr.2d 842]; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 149, fn. 22 [93 Cal.Rptr. 234, 481 P.2d 242].) GSB argues the facts are undisputed, and the only question to be decided is one of law, to which we apply an independent or de novo review. (*Bodell Construction Co. v. Trustees of Cal. State University* (1998) 62 Cal.App.4th 1508, 1515 [73 Cal.Rptr.2d 450].) The judgment withstands scrutiny under both tests: (1) There is substantial evidence supporting OCWD's dispositive factual finding that Colich did not require the bond, but simply accepted GSB's offer to provide one, thus GSB's refusal to execute the subcontract containing its *own* gratuitous bond provision constituted grounds for substitution under section 4107, subdivision (a)(1); and (2) as a matter of fundamental statutory construction, i.e., a question of law (*Rudd v. California Casualty Gen. Ins. Co.* (1990) 219 Cal.App.3d 948, 951–952 [268 Cal.Rptr. 624]), the Act prohibits a contractor from imposing on a subcontractor a bond requirement previously undisclosed in a *written or published* request for subbids, but it does not cover the fact situation here, where, as GSB concedes, there was no such request.

### Construction of the Statute

The parties have advised us, and we concur, that this appeal presents a question of statutory interpretation that is one of first impression in California. Having found no California case construing section 4108's mandate pertaining to subcontractor bonds, we will utilize established principles to guide our statutory interpretation.

██ "The process of interpreting the statute to ascertain [the lawmakers'] intent may involve up to three steps." (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082 [36 Cal.Rptr.3d 650].) The first step is to look at the words of the statute itself as the "primary determinant" of legislative intent. (*Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 60 [53 Cal.Rptr.2d 741].) As stated by our Supreme Court in *California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 338 [33 Cal.Rptr.2d 109, 878 P.2d 1321], "[O]ur function is to 'ascertain the intent of the lawmakers so as to effectuate the purpose of the law.' [Citations.] We determine such intent by first focusing on the words used by the Legislature, giving them their ordinary meaning. [Citation.] This is because 'it is the language of the statute itself that has successfully braved the legislative gauntlet.' "

Section 4108, entitled "Faithful performance and payment bonds of subcontractors," provides, in its entirety, "(a) It shall be the responsibility of each subcontractor submitting bids to a prime contractor to be prepared to submit a faithful performance and payment bond or bonds if so requested by the prime contractor. [¶] (b) In the event any subcontractor submitting a bid to a prime contractor does not, upon the request of the prime contractor and at the expense of the prime contractor at the established charge or premium therefor, furnish to the prime contractor a bond or bonds issued by an admitted surety wherein the prime contractor shall be named the obligee, guaranteeing prompt and faithful performance of the subcontract and the payment of all claims for labor and materials furnished or used in and about the work to be done and performed under the subcontract, the prime contractor may reject the bid and make a substitution of another subcontractor subject to Section 4107. [¶] (c)(1) The bond or bonds may be required under this section only if the prime contractor in his or her *written or published* request for subbids clearly specifies the amount and requirements of the bond or bonds. [¶] (2) If the expense of the bond or bonds required under this section is to be borne by the subcontractor, that requirement shall also be specified in the prime contractor's *written or published* request for subbids. [¶] (3) The prime contractor's failure to specify bond requirements, in accordance with this subdivision, in the *written or published* request for subbids shall preclude the prime contractor from imposing bond requirements under this section." (Italics added.)

██ GSB construes the statute as requiring the prime contractor *always* to specify the bond requirement, whether or not it issues a written or published request for subbids. In so doing, GSB reads *out* of the statute the thrice-appearing qualifying adjectives italicized, *ante*, namely, "written or published" and three times substitutes in their place an unqualified *"all."* Neither the deletions nor the substitutions are allowed. (Code Civ. Proc., § 1858 ["In the construction of a statute . . . , the office of the Judge is simply to ascertain

and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted"]; *Warmington Old Town Associates v. Tustin Unified School Dist.* (2002) 101 Cal.App.4th 840, 857 [124 Cal.Rptr.2d 744] ["We must avoid an interpretation that would make some of the words surplusage"]; *O'Kane v. Irvine* (1996) 47 Cal.App.4th 207, 211 [54 Cal.Rptr.2d 549] ["Where the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history"].)

GSB's deletions and insertions are not only impermissible under fundamental statutory interpretation principles, but they would do violence to the clear intent of the Legislature: In this respect, we discern no ambiguity, doubt, or uncertainty about what the Legislature meant when it said that a contractor's written or published request for subbids on a public contract must specify bond requirements the contractor intends to impose on the subcontractor. That being the case, there is nothing in the subject section to interpret or construe (*Katz v. Los Gatos-Saratoga Joint Union High School Dist.* (2004) 117 Cal.App.4th 47, 61 [11 Cal.Rptr.3d 546]), and we need not proceed to further analytical steps.

We note, however, GSB's alternate argument that a contractor who does not advertise for subcontractor bids cannot under any circumstances require a subcontractor to provide bonds. In other words, a contractor's nonpublished or nonwritten request for subbids in and of itself precludes the contractor from enforcing bond provisions, regardless of how they came into being. GSB offers no insight as to how the language of section 4108 can possibly be stretched to embrace this concept. The statute itself is not susceptible of this interpretation.

Finally, we disagree with GSB's contention there was no basis for substitution under section 4107, subdivision (a)(1) because GSB never really offered to obtain a bond, but simply represented it would do so *if required* by statute. Thus, GSB did not refuse to execute a subcontract reflecting its offer, and Colich had no legitimate basis for substitution. Of course, under GSB's reasoning, when GSB made its now-styled nonoffer, it already knew bonding *could not be a requirement* of the subcontract because it already knew Colich had not issued a written or published request for subbids specifying the bond requirement. What GSB is really saying is that its qualified "offer" to obtain a bond only "if required" was purely illusory, and neither OCWD nor the trial court could utilize it as grounds for substitution. To state the proposition is to reject it.

## DISPOSITION

The judgment is affirmed. Colich and OCWD shall recover costs on appeal.

Bedsworth, Acting P. J., and O'Leary, J., concurred.