163 Cal.App.4th 176 (2008)
KIMBERLY McCARTHER et al., Plaintiffs and Appellants,
v.
PACIFIC TELESIS GROUP et al., Defendants and Respondents.
No. A115223.
Court of Appeals of California, First District, Division Two.
May 23, 2008.
*181 Weinberg, Roger & Rosenfeld and David A. Rosenfeld for Plaintiffs and Appellants.
Paul, Hastings, Janofsky & Walker, J. Al Latham, Jr., Thomas E. Geidt and Laura N. Monfredini for Defendants and Respondents.
OPINION
LAMBDEN, J.
Kimberly McCarther and Juan Huerta (collectively, plaintiffs) appeal from the trial court's grant of the motion for summary judgment by Pacific Telesis Group, Pacific Bell Telephone Company, Advanced Solutions, Inc., Southwestern Bell Video Services, Inc., Pacific Bell Information Services, SBC Services, Inc., and SBC Telecom, Inc. (collectively, defendants), and the court's denial of plaintiffs' motion for summary adjudication. Plaintiffs' appeal presents a pure question of law. Labor Code section 233[1] requires employers to allow their employees to use "sick leave," as defined in section 233, to attend to an illness of a child, parent, spouse, or domestic partner, so-called "kin care" leave. Plaintiffs argue that section 233 applies to the "sickness absence" policy to which they are subject as employees of their respective defendant companies. Defendants argue that section 233 applies to "traditional accrual-based sick leave policies" only, and not to the "sickness absence" policy. We conclude that section 233 applies to the policy, and reverse the trial court's judgment.

BACKGROUND
The parties agreed below about the facts in a stipulated statement of undisputed facts, which we now summarize in relevant part.

Plaintiffs' Background
Plaintiff Huerta was absent from work for several days in 2004 to attend to his ill mother. His employer, defendant Pacific Bell Telephone Company, did not pay him for his absences (he was allowed to use a paid personal day for one of the days), count his absences as an "occurrence" of absence under the company's "attendance management" policy, or discipline him.
*182 Plaintiff McCarther was absent for seven consecutive workdays in 2004 to care for two of her children. Her employer, defendant SBC Services, Inc., did not pay her for her absences and later denied her request that she be paid for them under the federal Family and Medical Leave Act of 1993. McCarther filed a grievance, which was denied. Her absences were counted as an "occurrence," but she later was told that she was "meeting standards" because she had only two occurrences in the past 12 months. SBC Services did not discipline her.
In 2005, plaintiffs sued defendants[2] in Alameda County Superior Court on behalf of themselves and all others similarly situated. Plaintiffs' second amended complaint alleged three causes of action, each of which relied on the allegation that defendants violated section 233 by failing to make "sickness absence" payments pursuant to section 5.01F of the subject collective bargaining agreement (section 5.01F) for leave taken to attend to family member illnesses.[3]

Section 233
Prior to 1999, a person employed in California did not have the right to use employer-provided paid sick leave to care for a sick family member, sometimes referred to as "kin care" leave, without the employer's agreement. In 1999, the Legislature adopted section 233, which, as amended,[4] states in relevant part: "(a) Any employer who provides sick leave for employees shall permit an employee to use in any calendar year the employee's accrued and available sick leave entitlement, in an amount not less than the sick leave that would be accrued during six months at the employee's then current rate of entitlement, to attend to an illness of a child, parent, spouse, or domestic partner of the employee. All conditions and restrictions placed by the employer upon the use by an employee of sick leave also shall apply to the *183 use by an employee of sick leave to attend to an illness of his or her child, parent, spouse, or domestic partner."[5]
(1) The definition of "sick leave" as defined in section 233 is at the center of this appeal. Section 233, subdivision (b) states: "`Sick leave' means accrued increments of compensated leave provided by an employer to an employee as a benefit of the employment for use by the employee during an absence from the employment," which absence occurs because of the employee's physical or mental inability to perform his work due to illness, injury or medical condition, because the employee is obtaining professional diagnosis or treatment for a medical condition of the employee, or because of other medical reasons of the employee, such as pregnancy or obtaining a physical examination. (§ 233, subd. (b)(4).)

Policies Regarding Absences
As the parties state in their stipulated statement of undisputed facts,[6] plaintiffs' absences from work are subject to a collective bargaining agreement between defendants and plaintiffs' union, the Communication Workers of America. Section 5.01F refers to a "sickness absence" policy. It states in relevant part: "All employees with at least one (1) year of service shall be paid for sickness absence beginning with the first scheduled working day of absence. Sickness absence payments shall be limited to a maximum of five (5) days in the seven-day period."
Thus, "[u]nder section 5.01F, [defendants'] bargaining unit employees are entitled to receive full pay when they are absent from work, whether in full-day or partial-day increments, for up to five consecutive days of absence in a seven-calendar-day period, when the absences are a result of their own illness or injury." "Once an employee returns to work following such an absence, even for part of a day, the provisions of section 5.01F are triggered whenever the employee again is absent due to his or her own illness or injury."
Furthermore, "[t]here is no cap or limit on the number of days that employees may be absent from work and receive full sickness absence payments under section 5.01F." As the parties state in paragraphs 15 and 16 *184 respectively of their stipulated statement of undisputed facts, employees "do not earn, vest, or accrue any particular number of paid sick days in a year under section 5.01F," and "do not have a `bank' of paid sick days that they accrue in increments over a period of time."
Since 1986, every collective bargaining agreement between defendants and plaintiffs' union has contained language about sickness absence payments that is substantially similar to that quoted above. During this time, "[defendants] and [plaintiffs'] union have interpreted and applied [sickness absence] payments as being available only for absences caused by employees' own illness or injury. [Plaintiffs'] [u]nion has not asserted in a grievance or in any other forum that section 5.01F entitles employees to be paid when they are absent from work to attend to the illness of a family member."[7]
Defendants also have administered an "attendance management" policy to regulate absenteeism and tardiness for many years. "[E]mployee absences that are not excluded from the policy may count as `occurrences' of absenteeism...." The general standard applicable to all categories of absence is that an "[a]bsence must be for valid reasons (generally illness, injury or emergency situations) as [defendants do] not allot a certain number of `sick days' per year." The parties agree that "[a]n absence for illness, although it is a `valid reason' for absence under the attendance policy," counts as an "occurrence" unless it is "excluded" for any of a variety of reasons.[8]
The "attendance management" policy provides that an "employee is `not meeting' [defendants'] attendance standards if all of the following are true: (1) the employee has four or more full days of absence in the past 12 months (or prorated equivalent for employees in their first year of service); (2) the employee has three or more `occurrences' of absence in that same 12-month period; and (3) no extenuating circumstances are evident." Alternatively, an employee is not meeting attendance standards "if both of the following are true: (1) an employee has eight or more `occurrences' of absence of any length (full-day or partial-day) in the last 12 months (or prorated equivalent for employees in their first year of service); and (2) no extenuating circumstances are evident."
*185 Defendants "practice" is to counsel employees who do not meet attendance standards. If there are further "occurrences" within the applicable timeframe, defendants apply progressive discipline, which can result ultimately in dismissal.

Proceedings Below
In April 2006, before proceeding with consideration of the class certification issue, the parties filed competing motions, defendants for summary judgment and plaintiffs for summary adjudication, to determine whether or not defendants owed plaintiffs a duty under section 233.[9] The trial court granted defendants' motion for summary judgment and denied plaintiffs' motion, stating: "The issue presented by both motions is whether the `sickness absence' payments provided to plaintiffs by defendants, pursuant to section 5.01 of applicable collective bargaining agreement ..., fall within the definition of `sick leave' contained in California Labor Code section 233. The parties posit, and the court agrees, that this is a purely legal issue, appropriate for resolution at this time, and in this context. [¶] Based upon the plain meaning of the words in Labor Code section 233, which defines `sick leave' as `accrued increments of compensated leave,' and undisputed facts numbers 15 and 16, the court finds that defendant's sickness absence payments are not `sick leave' under the kin care statutes. This finding is also supported by the court's review of the pertinent legislative history."
The trial court entered judgment dismissing the second amended complaint. Plaintiffs filed a timely notice of appeal.

DISCUSSION

I. Appellate Standards for Review and Analysis

Plaintiffs' appeal asks that we interpret the meaning of certain portions of section 233 to determine if it applies to the "sickness absence" policy, a question that is of first impression. The trial court's summary judgment/ adjudication order is subject to de novo review because the parties have stipulated to the relevant facts and the issues before us are questions of statutory interpretation. (MacIsaac v. Waste Management Collection & Recycling, Inc. (2005) 134 Cal.App.4th 1076, 1082 [36 Cal.Rptr.3d 650] (MacIsaac).) As this court has previously stated, "`[w]e begin with the fundamental rule that our primary task is to determine the lawmakers' intent.'" (Ibid.) We are required "`"to construe a statute to promote its purpose, render it reasonable, and avoid absurd consequences."'" (Quintano v. Mercury *186 Casualty Co. (1995) 11 Cal.4th 1049, 1055 [48 Cal.Rptr.2d 1, 906 P.2d 1057].) "The process of interpreting the statute to ascertain that intent may involve up to three steps." (MacIsaac, supra, 134 Cal.App.4th at p. 1082.) That is, "`we first look to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction.'" (Ibid.)

II. Section 233 Plainly Applies to the "Sickness Absence" Policy

(2) We conclude that the requirements of section 233 extend to the "sickness absence" policy because, pursuant to the policy, defendants provide "accrued increments of compensated leave ... to an employee as a benefit of the employment for use by the employee during an absence from the employment" due to illness or injury. (§ 233, subd. (b)(4).) We base our conclusion on the plain and commonsense meaning of the statute's text. The trial court erred in granting defendants' motion for summary judgment and denying plaintiffs' motion for summary adjudication.
(3) In determining the Legislature's intent, "`a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose.... The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.'" (Quintano v. Mercury Casualty Co., supra, 11 Cal.4th at p. 1055.) We are to give the words of a statute "`plain and commonsense meaning'" unless the statute specifically defines the words to give them a special meaning. (MacIsaac, supra, 134 Cal.App.4th at p. 1083.)
"[W]e do not view the language of the statute in isolation. [Citation.] Rather, we construe the words of the statute in context, keeping in mind the statutory purpose." (MacIsaac, supra, 134 Cal.App.4th at p. 1083.) However, "[i]dentification of the laudable purpose of a statute alone is insufficient to construe the language of the statute. `To reason from the evils against which the statute is aimed in order to determine the scope of the statute while ignoring the language itself of the statute is to elevate substance over necessary form. The language in which the statute is cast confines and channels its purpose.'" (Cortez v. Purolator Air Filtration Products Co. (2000) 23 Cal.4th 163, 176, fn. 9 [96 Cal.Rptr.2d 518, 999 P.2d 706].)
*187 At the center of the parties' debate is the meaning of the word "accrued," which appears three times in the portions of section 233 that we quote at pages 182-183, ante, including in the definition of "sick leave" found in section 233, subdivision (b). Plaintiffs argue that the dictionary meaning of "accrue"[10] is such that the trial court erred in finding the word can only mean "to periodically accumulate over time"; that under the proper definition of "accrue," section 233 applies to the "sickness absence" policy; that even under defendants' overly narrow definition, the statute applies; and that the trial court erred when it relied on paragraphs 15 and 16 of the stipulated statement of undisputed facts.
Defendants argue that the repeated use of the word "accrued" in section 233 shows a legislative intention to limit the reach of section 233 to "traditional accrual-based" sick leave policies only, which reach falls short of the "sickness absence" policy; that the stipulated facts stated in paragraphs 15 and 16 are dispositive; that the "universal" dictionary definitions of the word "accrued" as used in section 233 are such that "[t]he only plausible reading of `accrued' is periodic accumulation over time," which does not occur under the "sickness absence" policy; that plaintiffs' various arguments about the meaning of "accrue" also fail because they drain the word "accrued" of any meaning when applied to the "sickness absence" policy; and that section 233 obviously does not apply because it calls for a calculation of the "kin care" leave employees accrue, which cannot be measured under the "sickness absence" policy.
We turn now to a discussion of these matters in further detail.

A. The Meaning of "Accrued"

1. The Parties' Arguments

The parties engage in an extensive debate over the dictionary meaning of the word "accrued."[11] We briefly review these arguments.
Plaintiffs contend that the trial court erred when it accepted defendants' argument that "`accrue' is a `centuries-old English word' that can only have one meaning`to periodically accumulate over time.'" Among other things, they point out that "[t]o periodically accumulate over time" is only one of *188 three offered senses of "accrue" in In re Marriage of Shore (1977) 71 Cal.App.3d 290 [139 Cal.Rptr. 349], the one California case cited by the parties which states a relevant definition. Relying on a 1971 edition of Webster's New Collegiate Dictionary, that appellate court defined "accrue" as: "`1: to come into existence as a legally enforceable claim 2: to come by way of increase or addition 3: to be periodically accumulated whether as an increase or a decrease' (Webster's New Collegiate Dict. (7th ed. 1971) p. 6)." (In re Marriage of Shore, supra, 71 Cal.App.3d at p. 295, fn. 3 [discussing "accrued" child support rights].) Plaintiffs also point out that the first definition listed in Black's Law Dictionary for "accrue" is "to come into existence as an enforceable right or claim."[12] Based on their review of case law and dictionaries, plaintiffs conclude that "accrue" means "comes into existence as an enforceable claim." They contend this is the true "centuries-old" definition, apparently based on a discussion in U.S. v. Vowell (1810) 9 U.S. 368 [3 L.Ed. 128] in which certain duties were said to "accrue" when a certain vessel "arrived at the port of entry." (Id. at p. 372.)[13]
Defendants contend "accrued" has a particular meaning when used as an adjective or transitive verb.[14] Specifically, the "universal dictionary definition of `accrued' when it is used as a transitive verb (that is, with a direct object, such as `sick leave') is `to accumulate over time,'" and, when used as an adjective, it "is `accumulated by growth' or `periodically accumulated over time,' or words to the same effect." From these multiple definitions, taken from certain dictionaries, defendants conclude that "[t]he only plausible reading of `accrued' is periodic accumulation over time."[15]
*189 Defendants acknowledge cases cited by plaintiffs involve the use of "accrue" in the sense of "vesting as a right" or "coming into existence as an enforceable claim." However, defendants contend these cases involve the use of "accrue" as an intransitive verb, and "in an entirely different context" than in section 233, and that "accrue" actually does not appear in the statute.

2. Analysis

We agree with plaintiffs that the dictionary meaning of "accrued" is not as limited as the trial court and defendants have concluded.
Defendants' and, apparently, the trial court's, conclusion that the only "plausible" reading of "accrued" in section 233 is "periodic accumulation over time" cannot be maintained. First, it is not supported by the definitions defendants provide for "accrued" when it is used in adjectival form. As they acknowledge, when used in adjectival form, "accrued" can mean simply "accumulated by growth," without reference to "periodic" or "over time." Most significantly, although Black's Law Dictionary does not contain a definition for "accrued" specifically, it does define several phrases which employ "accrued" as an adjective for things analogous to an "increment," including "accrued asset," "accrued compensation," and "accrued salary." (Black's Law Dict., supra, p. 22.) In each of these examples, the phrase is defined as a thing ("asset," "compensation," or "salary") "earned but not yet" due or paid. (Id. at pp. 126, 301, 1364.)[16]
Furthermore, defendants' contention that "accrued" has a "universal" dictionary definition when used as a transitive verb which supports their position is easily disproved by our own research. The unabridged Webster's Third New International Dictionary (2002) at page 13 states that "accrue" in transitive verb form means simply "gather, collect, accumulate," and lists as the example of usage, "authorized by law to [accrue] leave ... in the maximum amount of 120 days."[17] This definition is not materially different from one of the senses listed in the same definition for "accrue" when it is used as an intransitive verb, namely "to come by way of increase or addition: arise as a growth or result." (Ibid.) While one of the intransitive verb senses *190 listed is "to be periodically accumulated in the process of time, whether as an increase or decrease" (ibid.), which is very similar to defendants' proposed definition, the first intransitive verb sense listed is "to come into existence as an enforceable claim: vest as a right," which is very similar to plaintiffs' proposal (Ibid).
Indeed, the various meanings for "accrue" and "accrued" are not necessarily exclusive or inconsistent with each other. Rather, they reflect different shades of meaning which depend on the context in which the word is used. The discussion in Boothby v. Atlas Mechanical, Inc. (1992) 6 Cal.App.4th 1595 [8 Cal.Rptr.2d 600], is illustrative of such a flexible use of "accrued." The Third Appellate District analyzed a dispute about vacation time related to section 227.3, which section expressly refers to "vested vacation time." In the course of just one paragraph, the court used "vests," "accruing," "accumulating," "accrual," "vested," "accrued," and "earned," one after the other, to refer to the same event, the "accrual" of certain paid vacation time: "Because vacation in an amount established by the employment agreement is deferred compensation for services rendered, the right to paid vacation vests as the employee labors. It is nonforfeitable. However, if the employment agreement precludes an employee from accruing more vacation time after accumulating a specified amount of unused vacation time (a `no additional accrual' policy), the employee does not forfeit vested vacation pay. A `no additional accrual' policy simply provides for paid vacation as part of the compensation package until a maximum amount of vacation is accrued. The policy, however, does not provide for paid vacation as part of the compensation package while accrued, unused vacation remains at the maximum. Since no more vacation is earned, no more vests. A `no additional accrual' policy, therefore, does not attempt an illegal forfeiture of vested vacation." (Boothby v. Atlas Mechanical, Inc., supra, 6 Cal.App.4th at pp. 1601-1602, italics added.)
Similarly, our independent research of our state's case law indicates "accrued," whether as an adjective or a verb, is used flexibly, but nonetheless time and again in connection to something which has been "earned," or to which some right or claim is made. (See, e.g., Shirk v. Vista Unified School Dist., 42 Cal.4th 201, 215 [64 Cal.Rptr.3d 210, 164 P.3d 630] [referring to statutes which cause "previously accrued[[18]] claims for sexual molestation to accrue a second time"]; In re Marriage of Lehman (1998) 18 Cal.4th 169, 183 [74 Cal.Rptr.2d 825, 955 P.2d 451] ["[o]nce he or she has *191 accrued a right to retirement benefits"]; Massey v. Workers' Comp. Appeals Bd. (1993) 5 Cal.4th 674, 683 [20 Cal.Rptr.2d 825, 854 P.2d 117] [referring to "no accrued claim on which a conservator could act"]; Gerhard v. Stephens (1968) 68 Cal.2d 864, 905 [69 Cal.Rptr. 612, 442 P.2d 692] [stating that "plaintiffs could not be charged with knowledge of any accrued rights"]; Tevis v. City & County of San Francisco (1954) 43 Cal.2d 190, 199 [272 P.2d 757] [referring to "accrued overtime work" and to "accrued claims" within a few sentences]; In re Retirement Cases (2003) 110 Cal.App.4th 426, 440, 451, 460 [1 Cal.Rptr.3d 790] [in which this court referred, among other things, to "accrued vacation," "past accrued and unpaid benefits," and counties' "unfunded actuarial accrued liabilities"]; Alliance Financial v. City and County of San Francisco (1998) 64 Cal.App.4th 635, 646 [75 Cal.Rptr.2d 341] ["[a] party ... must communicate ... that a cause of action has accrued ..."]; Newmarker v. Regents of Univ. of Cal. (1958) 160 Cal.App.2d 640, 641-642 [325 P.2d 558] [in which this court referred to a complaint for declaratory relief in which plaintiffs assert "their rights to sick leave accrued before" a certain date, and to certain employee rules in which "the right to draw on accrued sick leave during periods of injury or illness was lost on termination of employment"].)[19]
(4) Thus, based on the definitions, case law, and Labor Code citations we quote and cite herein, it is apparent that the meaning of "accrued," whether used as an adjective or verb, generally falls into two overlapping categories. That is, "accrued" is used in reference to something that has come into existence as an enforceable claim, e.g., that has "vested" or been "earned," and that has accumulated, including periodically over time,[20] although the accumulation is not limited to such a method. It is also apparent from our review that "accrued," when used in relation to things analogous to "an increment of compensated leave," typically connotes some sort of claim of right to the thing described. Thus, we conclude that the plain and commonsense meaning of "accrued" when used in such contexts is most closely akin to that indicated in Black's Law Dictionary, something which is "earned but not yet" due or paid. (Black's Law Dict., supra, pp. 126, 301, 1364.)
We now examine the use of "accrued" in section 233 to determine if this plain and commonsense meaning applies in this particular context as well.

*192 B. The Use of "Accrued" in Section 233

(5) As we have already indicated, "we do not view the language of the statute in isolation. [Citation.] Rather, we construe the words of the statute in context, keeping in mind the statutory purpose." (MacIsaac, supra, 134 Cal.App.4th at p. 1083.) "Words ... do not have absolute and constant referents. `A word is a symbol of thought but has no arbitrary and fixed meaning like a symbol of algebra or chemistry....' [Citation.] The meaning of particular words or groups of words varies with the `... verbal context and surrounding circumstances and purposes in view of the linguistic education and experience of their users and their hearers or readers (not excluding judges).... A word has no meaning apart from these factors; much less does it have an objective meaning, one true meaning.' [Citation.] Accordingly the meaning of a writing `... can only be found by interpretation in the light of all the circumstances that reveal the sense in which the writer used the words.'" (Pacific Gas & E. Co. v. G. W. Thomas Drayage etc., Co. (1968) 69 Cal.2d 33, 38-39 [69 Cal.Rptr. 561, 442 P.2d 641]; see also B. C. Cotton, Inc. v. Voss (1995) 33 Cal.App.4th 929, 950-951 [39 Cal.Rptr.2d 484] [citing this passage in discussing the meaning of statutory language].)
(6) As we also have stated, "`[t]he words of the statute must be construed in context, keeping in mind the statutory purpose....'" (Quintano v. Mercury Casualty Co., supra, 11 Cal.4th at p. 1055.) The manifest purpose of section 233 is to enable employees to use certain "sick leave" to which the employees have obtained rights for "kin care" leave. Furthermore, "accrued" is used as an adjective in its past participle form with the noun "entitlement" in section 233, subdivision (a), which refers to "accrued ... sick leave entitlement." It is also used in this subdivision as a verb, i.e., "sick leave that would be accrued ... at the employee's then current rate of entitlement." The manifest purpose of section 233 and the Legislature's direct linkage of "accrued" and "entitlement" indicate that the Legislature intended the use of "accrued" to connote "increments" (which we discuss directly below) of compensated leave to which employees have gained rights; in other words, to which they have become "entitled" or, if you will, that employees have "earned."

1. "Accrued Increments"

Section 233 applies to "[a]ny employer who provides sick leave for employees...." (§ 233, subd. (a).) "Sick leave" is defined in the statute as "accrued increments of compensated leave provided by an employer to an employee as a benefit of the employment for use by the employee during an absence from the employment" for such reasons as illness or injury. (§ 233, subd. (b)(4), italics added.) Thus, "accrued" in its past participle form is employed as an adjective to the noun "increments."
*193 (7) The parties do not offer a definition for "increments," and we have not found one in our case law. The dictionary definition of the noun "increment" is, "an increasing or growth in bulk, quantity, number or value," an "enlargement" or "increase," "something that is gained or added: an added quantity or character," "one of a series of regular consecutive additions of like or proportional size or value," "one of a series of minute additions," "a slight or imperceptible augmentation," or "a positive or negative change in the value of one or more of a set of variables."[21] (Webster's 3d New Internat. Dict., supra, p. 1146.) In short, "increment," essentially refers to an addition or increasing, and can include, but is not limited to, one in a series of additions or increasings. In other words, it is very much like one sense of "accrued." It is not surprising that the noun "accruement" is defined as "accrual, increment." (Id. at p. 13, italics added.)
The use of "accrued" in past participle form is highly significant. By its employment of this form, the Legislature could only mean one thing: to refer to increments of compensated leave which have already accrued, rather than to refer to increments which are in some fashion "accruing," whether periodically or otherwise.
Thus, the meaning of "accrued increments" is plain. The Legislature defined "sick leave" in section 233, subdivision (b), as "increments," meaning "additions," of compensated leave that have "accrued," meaning that have already come into existence as enforceable claims, as opposed to increments that might do so in the future.
Nothing in section 233, subdivision (b), suggests the Legislature intended "accrued increments" to refer to increments that periodically accumulate over time, as defendants argue. To the contrary, if the Legislature had so intended, at the very least it would have referred to "accruing increments," or "accruing increments that have already accrued."

2. "Accrued and Available"

As we have already discussed, our conclusion about the plain meaning of "accrued" is further supported by its use in section 233, subdivision (a), including as an adjective to "entitlement." There is another adjective to "entitlement" in the subject phrase, which phrase relates to the limitation of an employee's use of "sick leave" "in any calendar year" to "the employee's *194 accrued and available sick leave entitlement...." (§ 233, subd. (a), italics added.) Defendants note that plaintiffs argued in their reply brief to the trial court that "[a]ccrual means availability," and argue this interpretation drains "accrued" of all meaning when coupled with "available." However, we have not adopted this definition.
(8) "Available" is defined as "capable of availing," "having sufficient power or force to achieve an end," "valid," "such as may be availed of: capable of use for the accomplishment of a purpose: immediately utilizable," "that is accessible or may be obtained," "personally attainable," or "at disposal, [especially] for sale or utilization." (Webster's 3d New Internat. Dict., supra, p. 150.)[22] We think it apparent that its meaning in this context, therefore, relates directly to the ability of employees to use "accrued" sick leave, meaning that which has already been earned, at a particular time. This choice of words recognizes the possibility that employees may have "accrued" sick leave, but nonetheless may need to satisfy certain conditions and meet certain restrictions before they can actually use it. The Legislature was plainly aware of this possibility and concerned about it, as it states in section 233, subdivision (a), that "[a]ll conditions and restrictions placed by the employer upon the use ... of sick leave ... shall apply" to "kin care" leave. (§ 233, subd. (a), italics added.)

3. Amount of "Sick Leave That Would Be Accrued"

Defendants also argue that section 233 cannot apply to the "sickness absence" policy because it cannot be explained or determined under plaintiffs' definition how much paid "kin care" leave "would be accrued during six months at the employee's then current rate of entitlement," which is the minimum amount of "accrued and available sick leave entitlement" employers must permit to be used in any calendar year. (§ 233, subd. (a), italics added.) We further address this issue in part F., post.

C. Section 234 and the Administration of "Kin Care"

Central to defendants' argument that section 233 does not apply to the "sickness absence" policy is their contention that they would not be able to regulate "kin care" leave because of the prohibition contained in section 234. This is incorrect.
*195 Section 234, enacted three years after section 233, states, "An employer absence control policy that counts sick leave taken pursuant to Section 233 as an absence that may lead to or result in discipline, discharge, demotion, or suspension is a per se violation of Section 233. An employee working under this policy is entitled to appropriate legal and equitable relief pursuant to Section 233." (§ 234.)
Defendants argue that "theoretically" an employee could be out under the "sickness absence" policy virtually every day of the year, and not be subject to their "attendance management" policy because of this prohibition. Plaintiffs appear to agree with this assessment of section 234, but do not seem troubled by the issue.
(9) Contrary to the parties' shared view, section 234 does not prohibit an employer's regulation of "kin care" leave taken by employees pursuant to section 233, provided that employers regulate sick leave and "kin care" leave in the same way. Section 233 expressly provides that "[a]ll conditions and restrictions placed by the employer upon the use by an employee of sick leave also shall apply to the use by an employee of sick leave to attend to an illness of his or her child, parent, spouse, or domestic partner." (§ 233, subd. (a).) Furthermore, section 233 provides that "[n]o employer shall deny an employee the right to use sick leave or discharge, threaten to discharge, demote, suspend, or in any manner discriminate against an employee for using, or attempting to exercise the right to use, sick leave to attend to an illness of a child, parent, spouse, or domestic partner of the employee." (§ 233, subd. (c).)
Defendants' "attendance management" policy monitors and regulates the "occurrences" of absence by an employee over the course of the previous 12 months. This policy includes certain standards which in effect restrict the employees' use of the "sick absence" policy based on defendants' stated "practice" of counseling and their escalating disciplinary action.
The parties, in asserting section 234 would prohibit any regulation of employees' use of "sickness absence" leave for "kin care" leave, overlook the language in section 233 that we quote directly above. We must construe section 234 and section 233, subdivisions (a) and (c) in context, give meaning to them both, harmonize them, and avoid an absurd result. (Quintano v. Mercury Casualty Co., supra, 11 Cal.4th at p. 1055.) It is plain that the Legislature intended by section 234 to make clear that employers who penalize employees for using "kin care" leave are committing per se violations of section 233, to the extent those employers do so with conditions and restrictions specific to the use of "kin care" leave beyond what section 233 allows. Section 234 refers to absence control policies against employees who *196 take sick leave "pursuant to Section 233," which "kin care" leave is specifically subject to the same conditions and restrictions as other sick leave. Furthermore, the language in section 234 is similar to that in section 233, subdivision (c), an indicator that section 234 was intended to supplement that provision by making it easier to obtain legal remedies for the violations covered.[23] In short, section 234 prohibits only those conditions and restrictions which go beyond those enforced with regard to sick leave generally.
Therefore, the argument that defendants' employees would be free to take off a virtually unlimited number of days for "kin care" leave without any consequences if section 233 applies to their "sickness absence" policy is incorrect, based on the plain meaning of sections 233 and 234, and defendants' existing "attendance management" policy.

D. The "Sickness Absence" Policy Provides for "Sick Leave"

Defendants argue, and the trial court agreed, that section 233 does not apply to the "sickness absence" policy because the policy does not provide any accrual of increments of compensated leave. This is incorrect.
Defendants provide their employees with "accrued increments of compensated leave ... for use by the employee during an absence from the employment" for illness or injury. That is, defendants' employees, after working for one year, are provided as a matter of right with increments of up to five consecutive days of compensated leave for their absences each time they become ill or injured, subject to defendants' "attendance management" policy. In other words, these increments are "earned" after one year, i.e., "accrued," although the increments themselves are not necessarily "due" or "paid" until the employees become ill or injured. (See Black's Law Dict., supra, pp. 126, 301, 1364.)
Defendants make much of the fact that under the "sickness absence" policy, employees do not "bank" any increments prior to illness or injury, or ever accrue a particular number of days in the course of a year, given that occurrences of illness or injury are inherently uncertain and, in fact, may never occur at all. These arguments are unpersuasive.[24]
*197 The major difference between the "sickness absence" policy and the "traditional" policies defendants discuss is the process by which employees receive their increments. Defendants argue, in essence, that in the "traditional accrual-based" policies, employees periodically "bank" increments of compensated leave over time based upon how much they work in the course of a given calendar year, and then draw from this existing "bank account" of increments when they become sick. As we have discussed, under the "sickness absence" policy, employees earn the use of five-day increments of compensated leave in the event of illness or injury after working for one year, but they do not actually "bank" these increments until they become ill or injured, and they lose any unused portions of increments upon their return to work.
(10) These differences between the "sickness absence" policy and "traditional accrual-based" policies are not particularly important for purposes of analyzing the application of section 233. In both instances, employees by their labors "earn" the use of increments upon an occurrence of "sickness." Whether these increments are "banked" in certain amounts in an employee account for use in the event of sickness prior to the sickness occurring, or simply made available in five-day increments upon an occurrence of sickness without an amount being previously established, is secondary. What is of primary concern is that under both policies employees at some point become entitled to use increments of compensated leave upon becoming sick. There is nothing in section 233 which indicates the Legislature's intent to treat these policies differently. To the contrary, the plain meaning of the text of section 233 indicates that it governs them both.
Defendants argue that it is significant that no five-day increment necessarily "accrues" if an employee does not become sick or injured under the "sickness absence" policy, and that applying section 233 to the policy would therefore drain the word "accrued" of any meaning. We do not agree. This contingency is not materially different from contingencies that very likely exist in "traditional" policies, including that employees must actually be sick in order to draw from any sick leave "bank account." Similarly, that the amount of "sickness absences" defendants' employees will actually use in the course of a particular year cannot be determined ahead of time does not alter the fact that these increments constitute "accrued increments of compensated leave ... as a benefit of the employment for use ... during an absence from the employment" for illness, injury, or the other matters itemized in section *198 233. (§ 233, subd. (b)(4).) Therefore, defendants provide "sick leave," and have a duty to employees pursuant to section 233.[25]

E. Stipulated Statements of Fact Nos. 15 and 16

The trial court improperly relied on stipulated statements of undisputed fact Nos. 15 and 16 for its ruling.[26] Nothing stipulated by the parties in those statements alters our analysis that section 233 applies to the "sickness absence" policy.
(11) Statement of fact No. 15 states in relevant part that "employees do not earn, vest, or accrue any particular number of sick days in a year." However, section 233 does not require the accrual of a particular number of sick days in a year. It merely requires that an employer provide "accrued increments of compensated leave." (§ 233, subd. (b)(4).)
(12) Similarly, stipulated statement of fact No. 16 states in relevant part that "employees do not have a `bank' of paid sick days that they accrue in increments over a period of time." Section 233 does not call for such a thing either. Whether an employee "banks" sick days for later use, or accrues sick days by a different procedure, as is the case with the "sickness absence" policy, is of no importance to the legislative mandate contained therein.

F. "Sick Leave That Would Be Accrued During Six Months"

Defendants contend it cannot be explained or determined under plaintiffs' definition of "accrued" how much paid "kin care" leave "would be accrued during six months at the employee's then current rate of entitlement," which is the minimum amount of "accrued and available sick leave entitlement" employers must permit to be used in any calendar year. (§ 233, subd. (a).) They argue that section 233 cannot apply to the "sickness absence" policy because, among other things, plaintiffs' interpretation is a "standardless interpretation" that "cannot be tethered to any ascertainable six-month rate of accrual." Defendants point to what they consider to be conflicts and weaknesses in plaintiffs' contentions, below and on appeal, about how much "kin care" leave defendants' employees would be entitled to pursuant to section *199 233. Defendants conclude that "there is no way to make section 5.01F of the bargaining agreement into an accrual system to which the statute applies."
Plaintiffs argue that we need not decide in this appeal the minimum sick leave to which they are entitled, but offer their views of possible amounts to which they would be entitled.
We do not determine any minimum because it is not an issue in this appeal. However, we address our interpretation of "accrued" to explain why it is not meaningless in the context of the phrase "in an amount not less than the sick leave that would be accrued during six months at the employee's then current rate of entitlement." (§ 233, subd. (a).)
(13) Defendants' argument again relies on a misunderstanding of section 233's terms and requirements. Section 233 does not require some mathematical calculation of an amount of "sick leave" that would be "banked" over a six-month period. Rather, section 233, subdivision (a) simply provides that employers must permit employees to use at least an amount of sick leave that "would be accrued during six months at the employee's then current rate of entitlement." (Italics added.) After working for one year, defendants' employees earn the use of five-day increments of compensated leave in the event of illness or injury, subject to defendants' "attendance management" policy. This is their "current rate of entitlement" "during" any six months of any calendar year thereafter. It is true that one cannot in advance calculate with mathematical certainty the amount of sick leave that employees would actually use in a six-month period because of the uncertainty of their illness or injury. However, section 233 does not require any such certainty. As we have also indicated, this lack of mathematical certainty does not alter the fact that during any given six-month period, employees are entitled to use an increment at any time upon the occurrence of illness or injury, subject to the strictures of the "attendance management" policy.[27] Thus, defendants' argument is without merit.

III. The Legislative History of Section 233

(14) We need not engage in the second level of statutory interpretation, an examination of extrinsic aids such as the legislative history of section 233, because, by the plain meaning of its text, section 233 unambiguously extends *200 to the "sickness absence" policy. "If the statutory language is clear and unambiguous, our task is at an end, for there is no need for judicial construction." (MacIsaac, supra, 134 Cal.App.4th at p. 1083.)
Defendants, however, contend that "[s]ection 233's legislative history shows a specific legislative intent to exclude sick leave policies such as [defendants'] that provide employees with virtually unlimited paid sick time off, in favor of narrowly-drawn coverage of traditional accrual-based sick leave policies." The trial court apparently agreed with their argument because it cited the legislative history as a basis for its ruling. We do not agree. The legislative history does not indicate the legislation that led to section 233 was amended so as to exclude "sickness absence" policies.
Defendants focus on three changes in legislation debated and amended over the course of two regular sessions of the Legislature from 1997 through 1999, when Assembly Bill No. 109 (1999-2000 Reg. Sess.) was passed, resulting in section 233's enactment in January 2000.[28] According to defendants, this legislative history "shows beyond any question that the Legislature substantively and consciously amended [Assembly Bill No.] 109 and its predecessor, [Assembly Bill No.] 480, so as to limit an employer's obligation to provide paid `kin care' leave to those sick leave policies under which employees `earn' or `accrue' sick leave in `increments,' and not to any and all forms of employee `sick leave entitlement'.... [¶] The original bill would have covered [defendants'] plan. The final bill did not."
Defendants first focus on changes to what ultimately became the first sentence of section 233, subdivision (a). In 1997, legislation was introduced to provide "kin care" leave that made no mention of "accrued" leave. This initial legislation, Assembly Bill No. 480 (1997-1998 Reg. Sess.), which the Legislature did not approve, stated that "[a]ny employer who provides sick leave for employees shall permit an employee to use the sick leave to which he or she is entitled...." The state Senate subsequently amended this in 1998 to provide that "[a]ny employer who provides sick leave for employees shall permit an employee to use the accrued and available sick leave to which he or she is entitled...." (Assem. Bill No. 480 (1997-1998 Reg. Sess.) § 1, as amended Apr. 13, 1998.) When the Legislature passed Assembly Bill No. 109 (1999-2000 Reg. Sess.) in the next regular session, it provided that "[a]ny employer who provides sick leave for employees shall permit an employee to use in any calendar year the employee's accrued and available sick leave entitlement...." (§ 233, subd. (a).)[29]
*201 These amendments show an intent to more precisely define the "kin care" leave to which employees were to be entitled, and to somewhat limit the scope of that leave. The Legislature moved from the somewhat amorphous reference to the use of "sick leave to which [employees are] entitled" to one referring to use of "accrued and available" sick leave in a particular calendar year. As we have already discussed, the insertion of "accrued and available" serves an important purpose, limiting the sick leave to that already obtained by employees in any given calendar year, and which can be used at a particular time. However, defendants' contention that the changes somehow excluded their "sickness absence" policy from the ambit of section 233 goes too far. It relies on their overly narrow definition of "accrued," which we have already discussed in our textual analysis. Defendants' argument also relies on the contention that the "sickness absence" policy provides "virtually unlimited paid sick time off," a characterization with which we cannot agree in light of the five-day limit of the increments provided and defendants' "attendance management" policy.
Second, defendants emphasize the changes in the amount of "kin care" leave to be provided. These changes in the amount of "kin care" leave to be provided do not show an intention to exclude the "sickness absence" policy. Defendants concede that the "sickness absence" policy would have been subject to the original bill, Assembly Bill No. 480 (1997-1998 Reg. Sess.), which would have required a "kin care" leave amount "not exceeding in any calendar year two-thirds of the employee's sick leave entitlement for that year . . . ." (Italics omitted.) We fail to see how the final, approved definition of the amount, which simply requires an amount "not less than the sick leave that would be accrued during six months at the employee's then current rate of entitlement" (§ 233, subd. (a)), differs from this initial calculation so as to exclude the "sickness absence" policy. If anything, the approved definition is more flexible, suggesting the Legislature's recognition that sick leave may "accrue" in different ways in different policies, and its intention to cover a broader range of policies than was clear from the initial legislation. Certainly, if the "sickness absence" policy is covered by the original definition, it is covered by the final one.
Finally, defendants point out that Assembly Bill No. 480 (1997-1998 Reg. Sess.) originally defined "sick leave" as meaning "payment by an employer of the normal compensation of an employee, out of the general assets of the employer, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties or is otherwise absent for medical reasons." In 1998, the state Senate changed the definition of "sick leave" in the bill to refer to "accrued increments of compensated *202 leave provided by an employer to an employee," which was then included in Assembly Bill No. 109 (1999-2000 Reg. Sess.) as well. Defendants' argument once more focuses on an amending which more precisely contours and, to some extent, limits, the parameters of the statute, but which does not go as far as defendants contend. Defendants also again rely on an incorrect interpretation of the word "accrued," which we have already discussed.

IV. The Reasonableness of Construction

The parties also debate construction of section 233 under the third tier of statutory interpretation. Again, we need not address this debate in light of our conclusion about the plain meaning of the statute. Nonetheless, we briefly address the parties' contentions.
"If ambiguity remains . . . then we must cautiously take the third and final step in the interpretive process. [Citation.] In this phase of the process, we apply `reason, practicality, and common sense to the language at hand.' [Citation.] Where an uncertainty exists, we must consider the consequences that will flow from a particular interpretation. [Citation.] Thus, `[i]n determining what the Legislature intended we are bound to consider not only the words used, but also other matters, "such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy and contemporaneous construction." [Citation.]'" (MacIsaac, supra, 134 Cal.App.4th at p. 1084.)
As defendants acknowledge, our Supreme Court has repeatedly recognized California's public policy to broadly construe protective statutes regulating the workplace in favor of employees, namely Smith v. Superior Court (2006) 39 Cal.4th 77 [45 Cal.Rptr.3d 394, 137 P.3d 218], and Morillion v. Royal Packing Co. (2000) 22 Cal.4th 575 [94 Cal.Rptr.2d 3, 995 P.2d 139]. Defendants argue that in both cases, the outcome "clearly was dictated by the statutory language and legislative history that applied to those cases." Defendants also contend that, for every case like these, "there are other cases in which an employee's proposed interpretation of protective employment legislation has been rejected, despite the policy of liberal construction," citing Reynolds v. Bement (2005) 36 Cal.4th 1075 [32 Cal.Rptr.3d 483, 116 P.3d 1162]. Defendants' arguments, however, implicitly recognize the continued vitality of the policy of liberal construction discussed in both Smith and Morillion.
Recently, our Supreme Court repeated this liberal construction policy in analyzing the scope of section 221, a provision contained in the same article of the Labor Code as section 233. The court stated that "[b]ecause the laws authorizing the regulation of wages, hours, and working conditions are *203 remedial in nature, courts construe these provisions liberally, with an eye to promoting the worker protections they were intended to provide." (Prachasaisoradej v. Ralphs Grocery Co., Inc. (2007) 42 Cal.4th 217, 227 [64 Cal.Rptr.3d 407, 165 P.3d 133]; see also Murphy v. Kenneth Cole Productions, Inc. (2007) 40 Cal.4th 1094, 1110-1111 [56 Cal.Rptr.3d 880, 155 P.3d 284] [noting that statutes regulating conditions of employment are to be liberally construed in the course of interpreting § 226.7].) It is plain that this policy requires that we liberally construe the language of section 233, were we unable to discern whether or not it applies to the "sickness absence" policy based on the plain meaning of its text. In that event, we would also find that section 233 applies.
Defendants make a number of unpersuasive arguments in support of their contention that it makes no sense to conclude the "sickness absence" policy falls within the ambit of section 233. First, they contend that this "would effectively mandate a generous new fringe benefit, contrary to the Legislature's stated intent." The "stated intent" defendants provide is correspondence from Assemblyman Knox, the author of Assembly Bill No. 109 (1999-2000 Reg. Sess.), to Governor Davis stating that the bill did not require employees to provide sick leave, or to provide more sick leave than that already provided. Assemblyman Knox's statement is correct. However, it has no particular bearing on the issues at hand.
Defendants next make a series of arguments which appear based on the false premises that they cannot in any manner regulate employees' use of "kin care" leave pursuant to section 233 because of the prohibition contained in section 234, and that the "sickness absence" policy allows for "unlimited" absences. As we have already indicated, this is incorrect, because employers are authorized by section 233 to regulate "kin care" leave under the same guidelines used for sick leave, and nothing in section 234 contradicts this mandate. Thus, defendants' arguments that providing "kin care" leave would give their employees "up to 130 days of paid absences whenever their family members have any kind of a minor illness," "insulate employees from discipline for absenteeism," "create the potential for serious abuse of attendance policies," "be enormously expensive and disruptive for employers such as [defendants] that already provide generous time-off benefits," "penalize the employees who diligently show up for work," "result in a windfall benefit" for those "who already have been repeatedly absent," and lock them into a collective bargaining agreement that "no business of any kindnot even the most generous businesscould survive," are without merit.

*204 DISPOSITION
The trial court judgment is reversed. Plaintiffs are awarded costs of appeal. This matter is remanded for further proceedings consistent with this opinion.[30]
Haerle, Acting P. J., and Richman, J., concurred.
NOTES
[1] All further unspecified code sections refer to the Labor Code unless otherwise stated.
[2] Plaintiffs allege that "defendants are divisions of SBC Communications, Inc., a nationwide corporation providing telecommunication services to residential and business consumers. In California, the defendants provide telephone service, DSL connections and other telecommunications services. The defendants own and operate facilities throughout the state to meet the needs of its customers."
[3] Plaintiffs' first cause of action alleged that defendants' failure to comply with sections 233 and 234 violated Business and Professions Code section 17203, their second cause of action alleged a violation of section 233, and their third cause of action alleged entitlement to certain civil penalties. Plaintiffs sought injunctive relief, awards of statutory and/or civil penalties and of restitution, an equitable accounting, a determination that theirs was an appropriate class action, damages, and attorney fees and costs.
[4] The Legislature extended section 233's protection to domestic partners and children of domestic partners in 2001. (Historical and Statutory Notes, 44 West's Ann. Lab. Code (2003 ed.) foll. § 233, p. 344.)
[5] Section 233, subdivision (a), also states, "This section does not extend the maximum period of leave to which an employee is entitled under Section 12945.2 of the Government Code or under the federal Family and Medical Leave Act of 1993 (29 U.S.C. Sec. 2606 et seq.), regardless of whether the employee receives sick leave compensation during that leave."
[6] All of the facts, as well as the quoted material in this part, are taken directly from this stipulated statement.
[7] In addition to "sickness absence" payments, employees "are entitled to request a certain number of paid personal days off per yeargenerally six days in the case of regular, full-time employees who have at least six months' service. Employees may request a personal day off for any reason or no reason. Whether or not the request will be granted depends primarily on the employer's `force requirements and needs for the service.'"
[8] For example, it is excluded "if it is a workers' comp injury" or it is protected by the Family and Medical Leave Act. Also, the use of a "personal day off" is not considered an "occurrence."
[9] Plaintiffs' motion also raised the issue of duty with regard to section 234.
[10] As defendants point out, plaintiffs repeatedly refer to "accrue," but it is actually "accrued" that appears in the statute.
[11] The extensive debate calls to mind a passage in Lewis Carroll's Through the Looking Glass, in which Humpty Dumpty explains his use of a word to Alice. "When I make a word do a lot of work like that, said Humpty Dumpty, I always pay it extra." (Carroll et al., The Annotated Alice (2000) p. 213.)
[12] Plaintiffs cite to the seventh edition of Black's Law Dictionary. The eighth edition first defines "accrue" as "[t]o come into existence as an enforceable claim or right; to arise," and provides an example of a cause of action that "did not accrue" until the occurrence of a certain event. (Black's Law Dict. (8th ed. 2004) p. 22.)
[13] Plaintiffs also invoke the "liberal construction" doctrine, which we discuss in part IV., post.
[14] "Accrued" is used as an adjective in section 233, subdivision (a), to describe "accrued and available sick leave," and in section 233, subdivision (b) to describe "accrued increments of compensated leave."

Defendants contend "accrued" is used as a transitive verb in section 233, subdivision (a), to describe "the sick leave that would be accrued during six months at the employee's then current rate of entitlement." (Italics added.) Defendants do not fully explain how "accrued" qualifies as a transitive verb in this instance, contending only that it is used with "sick leave" as the direct object. We question this characterization, particularly when both are used in a prepositional phrase without a clear subject. However, for the sake of argument, we accept their characterization.
[15] On the previous page of their reply brief, defendants contend that "`accrued' can only reasonably be read to mean an amount that periodically increases over time." (Italics added.) We analyze defendants' arguments under the "accumulation" definition, since that is the definition they also offered to the trial court.

We note that there can be a significant difference between a thing which "periodically increases over time" and which "periodically accumulates," "whether as an increase or decrease." The former refers to something that only grows periodically, and which does so over time. The latter refers to something that periodically increases or diminishes, and which does not necessarily build over the course of time.
[16] For clarity's sake, we note that Black's Law Dictionary defines "earn" as: "1. To acquire by labor, service, or performance. 2. To do something that entitles one to a reward or result, whether it is received or not." (Black's Law Dict., supra, p. 547.)
[17] Defendants note the word is "accrued" rather than "accrue," but we fail to see how a change to the past participle form could alter the word's meaning to "a periodic accumulation over time."
[18] In all of the material we quote in this paragraph, we have placed the word "accrued" in italics for the reader's convenience.
[19] Plaintiffs, for example, refer to the use of "accrued" in Baldwin v. Marina City Properties, Inc. (1978) 79 Cal.App.3d 393, 408 [145 Cal.Rptr. 406], and Quemetco Inc. v. Pacific Automobile Ins. Co. (1994) 24 Cal.App.4th 494, 502-503 [29 Cal.Rptr.2d 627] (both discussing an "accrued right").
[20] Even then, it can refer to a thing which has "`periodically accumulated whether as an increase or a decrease' (Webster's New Collegiate Dict. (7th ed. 1971) p. 6)." (In re Marriage of Shore, supra, 71 Cal.App.3d at p. 295, fn. 3.)
[21] Other listed senses for the word "increment" are "increase in volume or value of a forest or its products during a given period," and "an amount of powder packed in a bag that may be added or removed from the propelling charge of semifixed or separate loading ammunition to permit fire at varying ranges and with varying angles of impact." (Webster's 3d New Internat. Dict., supra, p. 1146.)
[22] Other senses are "having a beneficial effect" (in an archaic sense), "of a taxonomical designation not currently preferred by properly published and not invalidated by other usages," "having the requisite political associations and circumstantial qualifications for winning election to office," "willing to accept nomination for or election to office," "present in some chemical or physical form [especially] in the soil as to be capable of being utilized by a plant or animal," or "of a chemical element or compound: in a reactive form." (Webster's 3d New Internat. Dict., supra, p. 150.)
[23] That section 234 was not intended to alter any mandates in section 233 is particularly evident because the Legislature adopted section 234 after section 233, and did not delete the language from section 233 that we quote herein. (See Mission Valley East, Inc. v. County of Kern (1981) 120 Cal.App.3d 89, 95 [174 Cal.Rptr. 300] [rejecting a statutory interpretation argument because the Legislature, upon amending the statute in question, did not delete certain language already in the statute].)
[24] Defendants also argue that "[p]laintiffs admit that employees who are sick for the first time in a year had accrued nothing to that point. This admission undermines their whole theory." In our view, however, the increments are accrued after one year of employment, as we discuss herein. Therefore, this argument is also unpersuasive.
[25] Plaintiffs argue that even under defendants' definition of "accrue," i.e., "periodically accumulate over time," their entitlement to "sickness absence" payments comes under section 233. We need not address this issue in light of our holding.
[26] Defendants also cite as support for the trial court's position the deposition testimony of plaintiff Huerta acknowledging that he does not "get any particular predesignated number of sick days a year," nor receive any accrued sick leave days in an accrued sick leave bank. However, this testimony does not establish anything more than what is stated in the stipulated statements of fact.
[27] Plaintiffs argue that "[t]here are at least two ways" to calculate the amount of "kin care" leave required by section 233, they being "a maximum of 2 and one-half days per week or 26 weeks of 5 days." We need not and do not address the merits of these proposed calculations.
[28] Defendants review the legislative history in their briefing. The history is contained in the record, because the trial court granted defendants' request for judicial notice below.
[29] Defendants also emphasize a statement by the legislative counsel in a written opinion letter commenting on this section, which stated that "[u]nder the ordinary meaning of the words in this sentence, section 233 applies only to that portion of an employee's sick leave that has accrued and is available, and to which the employee is entitled . . . ."
[30] Plaintiffs request that we also instruct the trial court to grant their motion, deny defendants' motion, and grant additional relief, "including immediate injunctive relief sought by their prayer for relief." We decline to so instruct and order.