Filed 3/9/23  P. v. Stokes CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br>v.<br>ERNEST STOKES,<br>　　　Defendant and Appellant. | A160194<br><br>(Contra Costa County<br>Super. Ct. No. 5-080568-9) |

A jury found defendant Ernest Stokes to be a sexually violent predator (SVP) within the meaning of the Sexually Violent Predators Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.),[1] which provides for the involuntary civil commitment of certain sexually violent offenders—those with a diagnosed mental disorder who are likely to commit sexually violent crimes—before the end of their prison term.  The trial court ordered Stokes committed to the custody of the Director of Mental Health for the State of California for an indeterminate term.

On appeal, Stokes seeks reversal and remand for further proceedings by arguing that (1) the trial court failed to conduct a sufficient inquiry and appoint new counsel after Stokes challenged his public defender's decision

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

not to bring a *Vasquez* motion[2] and claimed there was a conflict of interest; (2) the trial court erred in admitting evidence under the hearsay exception of section 6600, subdivision (a)(3) (section 6600(a)(3)); and (3) the trial court erred in sustaining an objection to a question during cross-examination of an expert witness regarding his annual compensation. We affirm.

**BACKGROUND**[3]

### A. *Stokes's Qualifying Offenses*

In 1972, Stokes was found guilty of rape (Pen. Code, § 261) of victim D.D. and sentenced to an indeterminate term of three years to life. According to the police report, D.D. stated that Stokes had come into her apartment with a friend of hers. After the friend left and D.D. told Stokes to leave, Stokes accused her of stealing an ounce of heroin from someone else, grabbed her by the neck, and threatened to kill her if she did not do what he said. Stokes removed her clothing and raped her. Stokes was released on parole in October 1975.

In November 1975, one month after his release, Stokes forcibly kidnapped victim K.C. According to the police report, Stokes had disabled K.C.'s car while she was at work and then offered to fix it when it wouldn't start. Stokes got into the car and asked for a ride. When K.C. attempted to drop Stokes off near his home, Stokes grabbed her by the neck, pushed a knife against her rib, and told her he was going to kill her. Stokes put his hand on her breast and forced her to kiss him on the lips. K.C. was able to

---

[2] *People v. Superior Court* (*Vasquez*) (2018) 27 Cal.App.5th 36.

[3] The following is a brief summary of some of the factual and procedural background in this case, which we set out to provide context to the issues raised on appeal. We include additional facts in our legal discussion as relevant.

pull into a gas station, at which point Stokes jumped out of the vehicle and fled.  K.C. believed Stokes was going to rape her.

Later that same day, Stokes also forcibly kidnapped 14-year-old victim E.B.  According to the police report, Stokes approached E.B. as she was walking on the street and asked for directions to a house.  When E.B. pointed to the house, Stokes grabbed her and forced her behind a nearby church.  Stokes pushed her up against the building and told her he would kill her if she didn't stop screaming.  Stokes held a knife to her throat and told her to take off her coat and unbutton her pants.  After E.B. told Stokes she was on her period, Stokes made her prove it by showing her pad and then told her to " 'get out of here.' "

Stokes pled guilty to both counts of kidnapping (Pen. Code, § 207).  The trial court adjudged Stokes to be a mentally disordered sex offender under the former mentally disordered sex offender (MDSO) law (former §§ 6300–6330), and ordered him to be placed at Atascadero State Hospital.[4] Dr. Gloria Bentinck had interviewed Stokes and filed a report as part of the MDSO evaluation.  Stokes was returned to court from Atascadero State Hospital in 1977 and sentenced to one to 25 years for each of the kidnappings.  Stokes was released on parole in January 1982.

In December 1983, Stokes committed two counts of forcible rape and forcible kidnapping of victim L.T., as well as possession of a dirk or dagger. (Pen. Code, §§ 207, 261, subd. (a)(2), 12020, subd. (a).)  According to the police report, Stokes was at L.T.'s apartment when he grabbed her, forced her to the bed, and threatened to kill her.  He forced L.T. to disrobe at knifepoint and

---

[4] Under this former law, sentencing of an MDSO was suspended after conviction and the offender was committed to a state mental hospital for treatment.  (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1143 & fn. 3.)

raped her twice.  Stokes then made L.T. drive him around, under threat of death and with a dagger on his lap.  When they finally stopped at a gas station, L.T. got another customer to call the police.  Stokes was convicted on all counts and sentenced to 39 years in state prison.

## B.  *Petition for Commitment*[5]

Stokes was referred by the CDCR to the DSH for evaluation before his expected release in 2008.  Stokes was found to have met the SVP statutory criteria.  In May 2008, the Contra Costa County District Attorney's Office filed a petition to commit Stokes as an SVP.  In July 2008, the trial court found probable cause to believe Stokes was an SVP, and ordered him confined at Coalinga State Hospital pending trial.

## C.  *Motion in Limine*

Prior to trial, Stokes moved in limine to exclude evidence regarding his statements to Dr. Bentinck as included in her 1976 MDSO evaluation report.

---

[5] The petition process for involuntary commitment of an SVP is outlined in section 6601.  The California Department of Corrections and Rehabilitation (CDCR) must conduct an initial screening to determine whether an inmate may be an SVP and if so, it must then refer the inmate to the Department of State Hospitals (DSH) for a full evaluation by two psychiatrists or psychologists.  (§ 6601, subds. (a)–(c).)  If both evaluators concur that the inmate is an SVP, DSH forwards a request to county prosecutors to file a commitment petition.  (*Id.*, subds. (d), (h).)  If one of the evaluators does not concur, DSH must arrange for further examination by two independent professionals.  (*Id.*, subd. (e).)  If the county prosecutors agree with the recommendation, a petition for commitment "shall" be filed. (*Id.*, subd. (i).)  Upon the filing of the petition, the trial court must review it and "determine whether there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release."  (§ 6602, subd. (a).)  If there is probable cause, the trial court must order that the person remain in custody until a trial is completed to determine he or she is an SVP within the meaning of the SVPA.

Because Dr. Bentinck was now deceased and could not be called to testify, Stokes's statements to her could come in only through her report. The defense argued that the evidence contained hearsay. The People argued that the evidence was admissible under the hearsay exception of section 6600(a)(3), which allows for "details underlying the commission of an offense" to be shown by documentary evidence. The trial court denied Stokes's motion, concluding that the statement related to the underlying circumstances of the offense and thus qualified under the hearsay exception.

The parties then stipulated to a description of the statements, which included admissions from Stokes that " 'he has a sexual problem and has had for some time' " and attempted to rape K.C., but " 'denies that it was he who accosted the fourteen year old.' " The stipulation also included Stokes's admission that " 'he has episodic, uncontrollable episodes of intense pressure, anger, and sexual urges with the goal of rape of a woman that he happens to notice and appears attractive to him at the time he has these feelings. It is not just sexual excitement but a combination of this and hostility, depression, and tension that can only be satisfied by rape[;] if the woman is cooperative it does not satisfy his need. He wishes only normal sexual relations with these women; is not interested in oral or anal activity. Frequent sexual experiences, which he enjoys, with cooperative females do not abolish this pathological drive, and it is not necessarily related to drinking or drug use. He describes these urges in a rather unusual way, saying it's as though half of him says to do it and half of him says not to, but the bad half always wins.' "

### D. *The People's Case*

The jury trial commenced in February 2020. The stipulation—containing not only Stokes's statements to Dr. Bentinck, but also the history

5

of Stokes's offenses—was admitted into evidence.  The People presented testimony from three expert witnesses:  Dr. G. Preston Sims, Dr. Robert Owen, and Dr. Mark Patterson.  Dr. Sims was a psychologist employed by DSH who had evaluated Stokes on five different occasions between 2013 and 2019.  For each evaluation, Dr. Sims concluded that Stokes met the statutory criteria for an SVP.  Dr. Sims diagnosed Stokes with a non-consent paraphilic disorder (involving deviant sexual arousal by non-consent or resistance from another) and anti-social personality disorder.  Stokes had not admitted to any of his offenses, demonstrated remorse, or shown empathy towards his victims.  Even considering Stokes was now 71 years old and used a wheelchair, Dr. Sims determined there was a serious and well-founded risk of a future offense because Stokes (1) "continues to have a deviant sexual interest in nonconsenting sexual activity," (2) has "a general lack of concern for others," and (3) given Stokes used a weapon in three of his four prior offenses, he still had the ability to make sexual activity "nonconsensual."

Dr. Owen was a psychologist contracted by DSH who had evaluated Stokes twice, first in 2008, and then again in 2019.  Dr. Owen also diagnosed Stokes with paraphilic disorder and anti-social personality disorder.  In his 2008 evaluation, Dr. Owen concluded that Stokes did not qualify as an SVP after finding Stokes's age (59 years old at that time) was a "strong protective factor."  In his 2019 evaluation, however, Dr. Owen concluded that Stokes did qualify as an SVP because he did not see "any kind of progress in treatment"—any change in thinking or in interactions with others—while Stokes was at Coalinga State Hospital.  Stokes had refused to enroll in sex offender treatment, even though it was available to him.  Stokes was "unwilling to address his problems" and "still adheres to his whole antisocial and psychopathic thinking."  Dr. Owen identified other statistically

6

significant risk factors for re-offense, including "criminal qualities," "sexual deviance," and "poor performance on parole." Dr. Owen also noted that Stokes did not have "well-defined and viable release plans," as he thought he might go to Louisiana and "look somebody up there" or "live down in the riverbed in Contra Costa County."

Dr. Patterson was a psychologist contracted by DSH who had evaluated Stokes in 2019. Dr. Patterson diagnosed Stokes with paraphilic disorder and anti-social personality disorder. Dr. Patterson considered not only the underlying offenses and his interview with Stokes, but also Stokes's records from Coalinga State Hospital. Those records identified instances of "aggressive" and "hostile" behavior towards staff that were consistent with anti-social personality disorder, including instances that had occurred only a month before trial. The records also showed that Stokes may use a wheelchair but doesn't necessarily need one, as "he can actually walk and he can even walk at a relatively fast rate." Dr. Patterson concluded that Stokes met the criteria for an SVP.

### E. *Stokes's Case*

The defense presented testimony from three expert witnesses: Dr. Christopher Fisher, Dr. Michael Musacco, and Dr. Craig King. Dr. Fisher was a psychologist hired by the defense who evaluated Stokes in 2013, 2016, and 2020. Dr. Fisher diagnosed Stokes with anti-social personality disorder, but not paraphilic disorder because his offenses did not fit a pattern of "specific language," "specific ritualized patterns of behavior," or "specific requirements of the victim." Dr. Fisher concluded that Stokes was unlikely to re-offend, given his advanced age and that there had been no indication of a sexual problem in his hospital setting.

Dr. Musacco was a psychologist employed by DSH who had evaluated Stokes on six different occasions between 2008 and 2019 on behalf of DSH (not as hired by the defense). Dr. Musacco diagnosed Stokes with paraphilic disorder and anti-social personality disorder. In his first five evaluations, Dr. Musacco concluded that Stokes was an SVP. Dr. Musacco changed his opinion in the sixth evaluation, still finding there was a qualifying mental disorder but that he "can no longer confidently conclude that [Stokes] represents a serious and well-founded risk." Dr. Musacco stated that Stokes was 71 years old and "hasn't committed any sexual crimes, granted in a custodial setting, but in most of his life now." Dr. Musacco noted that, based on his review of medical records, Stokes had been diagnosed with cancer that was now in remission and had had fluid in his lungs, cataract surgery, and an occluded carotid artery. But Dr. Musacco also noted that Stokes's "pattern of offending wasn't solely carried out by physical force. He also used a weapon, and he is still capable of using a weapon."

Dr. King was a psychologist hired by the defense to evaluate Stokes. Dr. King diagnosed Stokes with paraphilic disorder and an anti-social disorder. Dr. King concluded that Stokes was not an SVP because he "falls below the threshold for . . . likely to commit another sexually violent offense" given his age, health problems, and that he had "controlled whatever sexual acting out for 35 years."

The defense also presented testimony from two psychiatric technicians at Coalinga State Hospital. The first technician had worked on Stokes's unit for the past year and testified that Stokes had not presented any unusual behavioral problems. The second technician had worked on Stokes's unit for approximately two years and had not known Stokes to have any physical altercations with either other patients or staff.

8

## F. *Jury Verdict and Commitment Order*

The jury found Stokes to be an SVP within the meaning of the SVPA. The trial court issued an order committing Stokes to the custody of the Director of Mental Health for the State of California "for appropriate treatment and confinement" and "for an indeterminate period." This appeal followed.

## DISCUSSION

## I. Inquiry into Stokes's Claims

The SVPA provides that a person subject to petition for involuntary commitment as an SVP is entitled to the assistance of counsel, and that if the person is indigent, "the court shall appoint counsel to assist that person." (§ 6603, subd. (a).) "Although the Sixth Amendment right to counsel does not apply to such civil commitment proceedings, a defendant has a due process right to the effective assistance of counsel." (*People v. Orey* (2021) 63 Cal.App.5th 529, 567 (*Orey*).) Stokes was represented by counsel from the Contra Costa County Public Defender's Office in the SVP proceedings here.

On June 7, 2019, defense counsel advised the trial court that Stokes wanted to be heard regarding a motion and was requesting a hearing under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). The court excused the prosecutor and conducted an in camera hearing. Defense counsel indicated that Stokes "wanted to provide a document to the court." The transcript reflects that the trial court then reviewed two documents. The record contains two documents from Stokes file-stamped on June 7, 2019. One is titled "Notice of Actual Conflict," and requests that the court "address an actual conflict of interest" with his counsel. The other is a letter from Stokes asserting that "all parties in this process have acted together to deny me due process of law. The court has permitted continuances without any good cause

9

showing by either side. The [P]eople have failed, without good cause to bring my case to trial in a timely manner; and my own counsel has failed to offer any showing of good cause for the continuances to have gone on for over 11 years." The letter stated that Stokes's current counsel "is so burdened by his own self-interests that he cannot and will not say all that is to be said on my behalf with respect to a motion to dismiss which relies, in part, on his own legal malpractice." The letter requested that the court appoint "independent counsel" for Stokes, to confer with him and "file equitable pleadings for dismissal as will address the due process violations which have thus far taken place in this case[.]"

The trial court asked Stokes why it should grant a *Marsden* motion "because this is not what these documents say." Stokes responded that his defense counsel would not file a *Vasquez* motion to dismiss the petition based on the length of time in bringing his case to trial. Stokes then stated he sought to delay his trial because he had contacted the Innocence Project and wanted them to "look into" his underlying convictions. The court concluded: "I don't find that your motion is actually a *Marsden* and I think that I will just deny the *Marsden*."

Defense counsel then clarified that Stokes's "main" complaint was that he had been denied an opportunity for trial and wanted counsel to file a *Vasquez* motion. Stokes subsequently stated that he was still being treated for cancer and wanted a continuance of the trial. The court told Stokes he could request a continuance in three days, when he appeared before the trial judge. Defense counsel then responded to the concerns Stokes had raised about the public defender's office. According to defense counsel, the case had previously been set for trial, but on numerous occasions Stokes had indicated he did not want to proceed for health reasons and that the continuances had

10

been voluntary on Stokes's part. Stokes responded: "Most of them, yes." The court reiterated that the *Marsden* motion was denied.

The record reflects that, on February 4, 2020, Stokes "present[ed] a *Marsden* motion" and the trial court conducted a *Marsden* hearing. When the court asked Stokes about his issues and concerns, Stokes stated that his counsel would not file a motion to dismiss under *Vasquez* because, in counsel's opinion, Stokes did not qualify. Defense counsel then detailed his experience on the record, as well as his understanding that the delay of trial was based on Stokes's desire to "forgo trial because of health conditions." Stokes responded that he had only said "one time" that he did not want to go to trial, and that while his health had "got in my way a lot," there were times that he had said "let's just do it and get it over with." The court advised the parties that it needed to review the record before making a ruling.

The hearing was continued to February 21, 2020. The trial court had ordered "as many transcripts as I could find" because it "wanted to look up whether or not there was some systemic, procedural, administrative problem from how the public defender's office has handled your case to see if, in fact, that office could be in any way deemed incompetent, and that would warrant [defense counsel] and/or the public defender's office being relieved because of that and new counsel appointed."

The trial court recited the chronology of the case as follows: from August 2008 (after the probable cause determination) to May 2013, discovery was ongoing and defense counsel filed several motions, including a motion pursuant to *In re Ronje* (2009) 179 Cal.App.4th 509 for new evaluations and a motion to dismiss. From August 2013 to February 2014, there were "numerous discovery proceedings" as well as "continual case management conferences" with the court. Trial was set for November 2014. Based on new

11

discovery from the People provided to defense counsel the week before trial, the trial was continued with Stokes's permission to March 2015. Trial was reset to June 2015 due to conflicts for both attorneys. Based on new reports from the People's expert witnesses provided to defense counsel just before trial (and the Court of Appeal's grant of a writ after the trial court initially denied defense counsel's request for continuance), the trial was continued to November 2015. In November 2015, the trial was continued with Stokes's permission to January 2016. After Stokes's then-defense counsel was appointed to the bench and a new attorney was appointed to represent him, the trial was continued to October 2016. At the readiness hearing for that trial, defense counsel represented that Stokes did not desire to proceed with trial as he had "serious medical problems and may not survive [his] illness, which was terminal cancer." The matter was continued.

In March 2017, defense counsel represented that Stokes had requested a six-month postponement until after his chemotherapy. In January, May, and June 2018, the trial was continued due to Stokes's health issues. In August 2018, the People asked for a one-week continuance of the trial due to the unavailability of experts. The trial court found good cause over objection from the defense. The defense then asked for another continuance due to Stokes's health issues. The trial was continued to June 2019. In June 2019, Stokes requested a continuance due to his health conditions and "specialty treatment" he was receiving in or near Coalinga. The continuance was granted.

In September 2019, the People moved to continue the trial because one of the DSH evaluators (Dr. Musacco) had changed his opinion and DSH needed to appoint additional evaluators to comply with section 6601. The

trial court found good cause over objection from the defense. The trial was continued to February 2020, and proceeded at that time.

From this record, the trial court concluded that the case had been delayed by Stokes and his health issues, not because of any fault by the defense counsel or the public defender's office. The trial court denied the *Marsden* motion.

Stokes now argues that the trial court violated his due process rights by failing to conduct a sufficient inquiry into these matters, and should have appointed new counsel after Stokes provided notice of a potential conflict of interest. We analyze Stokes's underlying claims regarding his defense counsel in two parts.

First, Stokes challenged his counsel's decision not to file a *Vasquez* motion. At the June 2019 hearing attended by Stokes, defense counsel described Stokes's complaint that counsel had refused to file such a motion. Stokes himself described this same concern at the February 2020 hearing. *Marsden* is an appropriate vehicle for a defendant to challenge such decisions by counsel and seek their discharge. (*Orey*, *supra*, 63 Cal.App.5th at pp. 568–569 [*Marsden* motion based on decision not to file *Vasquez* motion].)

" ' "A defendant is entitled to have appointed counsel discharged upon a showing that counsel is not providing adequate representation or that counsel and defendant have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' " (*Orey*, *supra*, 63 Cal.App.5th at p. 568.) " ' "[A] *Marsden* hearing is not a full-blown adversarial proceeding, but an informal hearing in which the court ascertains the nature of the defendant's allegations regarding the defects in counsel's representation and decides whether the allegations have sufficient substance to warrant counsel's replacement." ' " (*Ibid*.) The hearing "provides the

13

defendant a confidential forum in which to present complaints about counsel's performance," and "provides appointed counsel the opportunity to address the defendant's concerns and to explain counsel's performance." (*Ibid.*)

Here, the parties were afforded with the process required by *Marsden*. At the June 2019 hearing, defense counsel stated that the continuances of trial were necessitated by Stokes's health issues and voluntary on his part. Stokes confirmed that was true for "most" of the continuances, as his health had "got in [his] way a lot." These explanations showed that defense counsel had made a tactical decision not to file a *Vasquez* motion because Stokes's own health issues caused delay in getting to trial. As explained in *Orey*, " '[t]actical disagreements between the defendant and his attorney do not by themselves constitute an "irreconcilable conflict" ' " and it is sufficient that an attorney's explanation for the tactical decision demonstrated defendant was receiving adequate representation and no irreconcilable conflict had arisen. (*Orey*, *supra*, 63 Cal.App.5th at pp. 568–569.)

The nature of Stokes's claims here, however, adds a second part to this analysis. According to Stokes, his counsel was unable or unwilling to file a *Vasquez* motion because it would cast negative light on the work of the public defender's office. "When the trial court knows, or reasonably should know, of the possibility of a conflict of interest on the part of defense counsel, it is required to make inquiry into the matter." (*People v. Bonin* (1989) 47 Cal.3d 808, 836 (*Bonin*).) In short, when a trial court is apprised of a potential conflict, it must also satisfy its duty of inquiry under *Bonin*.

While the trial court did not frame its inquiry as a *Bonin* inquiry, we nonetheless conclude that it satisfied this duty. At the February 2020 hearing, the trial court conducted an extensive inquiry into the circumstances

14

of the prior continuances. The early years of the case involved discovery and related proceedings. From 2016 to 2020, however, the trial continuances were almost entirely requested because of Stokes's health issues.[6] There was no indication that defense counsel had permitted continuances in the case without good cause. The trial court's inquiry here established that the continuances did not arise from any systemic breakdown in the public defender's office or its ability to defend SVP cases, or any dilatory conduct by defense counsel in bringing the matter to trial. We conclude that the inquiry was sufficient under *Bonin* because it dispelled the prospect of a conflict as claimed by Stokes.

Stokes's additional arguments to the contrary do not alter our conclusion. Stokes contends that we should ignore the trial court's inquiry at the second February 2020 hearing because the error occurred at the first June 2019 hearing. A trial court commits error when it violates its duty of inquiry into the possibility of a conflict of interest. (*Bonin*, *supra*, 47 Cal.3d at p. 836.) To obtain reversal for such error, however, a defendant must show that (1) an actual conflict of interest existed and (2) this conflict adversely affected counsel's performance. (*Ibid.*) We are not persuaded that the delay between these two hearings was a failure of the court's inquiry obligation that constitutes reversible error here. As described above, the record supports the trial court's determination that no conflict of interest existed. As for the specific period between the two hearings, the trial was continued during that time at Stokes's request due to health reasons. The People then

_____

[6] Stokes contends, in a footnote without citation to any evidence or authority, that *if* his health problems were "aggravated or extended" by failure of the government to provide appropriate healthcare, delays in his trial "might still constitute a due process violation." We cannot rely on a hypothetical to conclude Stokes satisfied his burden to show reversible error.

15

requested a further continuance of the trial due to a necessary appointment of additional expert witnesses. The continuance was granted upon a finding of good cause and over objection from the defense. Stokes has not shown that there was an actual conflict during this time period, let alone a conflict that adversely affected counsel's performance.

Stokes also argues that the trial court's own inquiry was insufficient, as new counsel should have been appointed "to investigate and argue the issue on his behalf." We disagree. In fulfilling its obligation to inquire into a potential conflict, the trial court "may, of course, make arrangements for representation by conflict-free counsel." (*Bonin*, *supra*, 47 Cal.3d at pp. 836–837.) "Conversely, it may decline to take any action at all if it determines that the risk of a conflict is too remote." (*Id.* at p. 837.) Here, the trial court conducted its own extensive examination of the record and concluded there was no actual conflict necessitating the appointment of new counsel.[7]

---

[7] We also note that this case is distinguishable from *People v. Carter* (2022) 86 Cal.App.5th 739 (review granted Mar. 1, 2023, No. S278262). In *Carter*, a defendant sought a *Vasquez* dismissal because of delays in his SVP trial and separately sought replacement of counsel via a *Marsden* motion. (*Carter*, at p. 745.) The trial court first denied the *Marsden* motion because, after a hearing on the motion, it found that defendant's current counsel had acted diligently in moving the case to trial. (*Carter*, at p. 748.) With regard to the *Vasquez* motion, defendant's counsel explained that she could not ethically file the motion because, to do so, she "would have to say that she was not fulfilling her ethical duty to pursue trial in a timely manner." (*Carter*, at pp. 748–749.) The trial court permitted the defendant to file a *Vasquez* motion in propria persona, but he rejected the opportunity to do so because he felt unable to capably represent himself. (*Carter*, at p. 749.) A divided panel of the Third District affirmed, holding that the trial court did not abuse its discretion in denying the *Marsden* motion because the record demonstrated that the defendant made a tactical decision to delay his trial in order to receive sex offender treatment in the state hospital. (*Carter*, at pp. 752–754.) The concurring and dissenting justice believed that the defendant's counsel did not sufficiently investigate the merits of a potential

In sum, we conclude that the trial court did not fail its obligation to inquire into Stokes's claims regarding his public defender's refusal to file a *Vasquez* motion and potential conflict of interest, and that any delay between initial notice of his claims and the trial court's full inquiry did not constitute reversible error here.

## II.    Admission of Statements to Dr. Bentinck

Stokes argues that the trial court erred when it admitted evidence of his statements to Dr. Bentinck under the hearsay exception of section 6600(a)(3). He contends that, given the language of the statute and the California Supreme Court's decision in *People v. Otto* (2001) 26 Cal.4th 200 (*Otto*), this evidence was not admissible under the exception. As the ruling raises a question of statutory construction, we review it de novo. (*People v. Grimes* (2016) 1 Cal.5th 698, 712.)

Section 6600(a)(3) provides, in relevant part, that "[t]he details underlying the commission of an offense that led to a prior conviction, including a predatory relationship with the victim, may be shown by

_____

*Vasquez* motion, and would have reversed and remanded for that inquiry to occur, with the prospect that substitute counsel could be appointed if defendant's counsel believed the motion had merit but declined to pursue it because of a conflict of interest. (*Carter*, at p. 761.)

The case before us is distinguishable because defense counsel did not refuse to even consider a *Vasquez* motion, but instead explained that his decision not to file such a motion was based on his understanding that the delays were caused by Stokes's health conditions. Furthermore, unlike in *Carter*, the trial court here did not confine its inquiry to whether Stokes's current counsel was diligently moving the case forward to trial. Instead, as we discuss above, it conducted a broader inquiry into the circumstances of the continuances in these proceedings. Based on an extensive review of the entire record of trial delays, it concluded that the case had been delayed by Stokes and his health issues, and thus dispelled the prospect of a conflict between Stokes and his lawyer.

17

documentary evidence, including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of State Hospitals."

We conclude that the plain language of the statute supports its application here. (See *MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082–1083 [interpretative process begins with the words of the statute itself as "[t]he Legislature's chosen language is the most reliable indicator of its intent" and "[i]f the statutory language is clear and unambiguous, our task is at an end, for there is no need for judicial construction"].) Section 6600(a)(3) explicitly authorizes the use of documentary evidence to show "details *underlying* the commission of an offense." This phrase captures the evidence admitted here: Stokes's own statements regarding his underlying feelings and the " 'sexual problem' " that motivated his offense. Moreover, section 6600(a)(3) explicitly includes state hospital evaluations in its examples of documentary evidence covered by the exception, like the report performed by Dr. Bentinck to determine if Stokes was an MDSO.

Despite Stokes's suggestion to the contrary, our conclusion is entirely consistent with *Otto* and its discussion of the legislative intent behind section 6600(a)(3). The defendant in *Otto* challenged admission of a presentence report containing victim statements. (*Otto*, *supra*, 26 Cal.4th at pp. 206–207.) This evidence involved multi-level hearsay: the victim statements in the report were hearsay, and the report was also hearsay "since presumably the court officer who prepared the report was not a percipient witness to the crime." (*Id.* at p. 207.) The defendant argued that the report was admissible under section 6600(a)(3), but that the victim statements contained in the

18

report were not admissible unless they fell within another exception to the hearsay rule.  (*Ibid.*)

*Otto* disagreed, holding that section 6600(a)(3) "implicitly authorizes" the admission of hearsay statements contained in those reports.  (*Otto*, *supra*, 26 Cal.4th at p. 207.)  It explained that the Legislature was "undoubtedly familiar with the typical contents of such reports," which include the victim's statement of the facts and circumstances of the crime, if available.  (*Ibid*.)  It also reasoned that, in permitting the use of documentary evidence, "the Legislature apparently intended to relieve victims of the burden and trauma of testifying about the details of the crimes underlying the prior convictions" and "may have also been responding to a concern that victims and other percipient witnesses would no longer be available."  (*Id*. at p. 208.)  *Otto* thus concluded:  "By permitting the use of presentence reports at the SVP proceeding to show the details of the crime, the Legislature necessarily endorsed the use of multiple-level-hearsay statements that do not otherwise fall within a hearsay exception."  (*Ibid.*)

Our multi-level hearsay analysis is simpler than in *Otto*:  here, Stokes made his own statements to Dr. Bentinck, which were admissible as party admissions (Evid. Code, § 1220), and Dr. Bentinck's report of those statements was admissible under section 6600(a)(3).  Like the court officer in *Otto*, Dr. Bentinck need not have been a victim or percipient witness for section 6600(a)(3) to apply.  (*Otto, supra*, 26 Cal.4th at p. 207.)  The underlying statements contained in the report were made by Stokes himself. Moreover, the admission of Stokes's statements is entirely consistent with the reasoning in *Otto*:  like presentence reports, the Legislature was "undoubtedly familiar" with the typical contents of state hospital evaluations, including any explanation or interpretation offered by defendant regarding

19

his own behavior. (*Ibid.*) We thus conclude that the trial court did not err in admitting the evidence of Stokes's statements to Dr. Bentinck under section 6600(a)(3).

### III. Cross-Examination on Annual Compensation

During the cross-examination of Dr. Owen, defense counsel asked: "And can you tell us how much you earn on an annual basis conducting these evaluations for the Department of State Hospitals?" The prosecutor objected on relevance grounds. After discussion with the parties in chambers, the trial court sustained the objection. Defense counsel asked no other questions on the topic. When the examination had concluded and the jury was excused, the court and parties put their discussion on the record. Defense counsel stated that he had "information suggesting that Dr. Owen earned approximately $400,000 a year doing contract work for D.S.H." and it was "relevant because what juries often think about when they're dealing with experts is whether or not they're hired guns and they are trying to determine credibility based on financial incentive." Defense counsel clarified that the alleged incentive would be "to write as many reports as possible" and avoid a high percentage of reports concluding that an individual was not an SVP, but counsel acknowledged he had no evidence of higher percentages leading to removal of evaluators by DSH. The trial court stated that defense counsel could have asked about evaluation statistics and DSH review without asking about Dr. Owen's annual compensation.

Stokes argues that the trial court erred when it sustained this objection, as Dr. Owen's annual compensation was relevant under Evidence Code section 722. Evidence Code section 722, subdivision (b) states: "The compensation and expenses paid or to be paid to an expert witness by the party calling him is a proper subject of inquiry by any adverse party as

20

relevant to the credibility of the witness and the weight of his testimony." The People respond that Evidence Code section 722 is inapplicable to the particular question posed here (because it pertained to Dr. Owen's annual compensation as a contractor with DSH, not his compensation as an expert witness), but even assuming some relevance, the court acted within its discretion under Evidence Code section 352 to sustain the objection.

Evidence Code section 352 vests the trial court with broad discretion to exclude otherwise relevant evidence if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Clark* (2011) 52 Cal.4th 856, 931–932.) We review such an exclusion of evidence for abuse of discretion. (*People v. Holloway* (2004) 33 Cal.4th 96, 134.) We agree with the People that the trial court's ruling here fell within its discretion under Evidence Code section 352. Defense counsel argued at trial that the question regarding Dr. Owen's annual compensation was relevant to his credibility based on an *assumption* that DSH penalized evaluators who had a high percentage of reports concluding that an individual was not an SVP. But the defense offered nothing to support this assumption. As the trial court explained, the defense had no evidence that such higher percentages lead to removal of evaluators by DSH or that evaluators had some other incentive to make a "positive" SVP finding. "[E]xclusion of evidence that produces only speculative inferences is not an abuse of discretion." (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.)

Finally, even assuming the trial court erred on this evidentiary ruling, we conclude that any such error was harmless. (*People v. Robinson* (2020) 47 Cal.App.5th 1027, 1032–1033 [errors under the Evidence Code are

reviewed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818 to determine "whether it was reasonably probable the error affected the outcome of the case"].) Dr. Owen testified that he had worked as an independent contractor for DSH for 24 years and had conducted 3,000 to 4,000 evaluations. The jury thus had information to determine whether or not Dr. Owen had a financial incentive that impacted his credibility. The jury was also presented with evidence contradicting Stokes's speculation that Dr. Owen was biased towards making positive SVP findings in order to maintain his contractor status with DSH. As a preliminary matter, Dr. Owen had initially concluded that Stokes was *not* an SVP. Moreover, all six of the expert witnesses testified about the percentage of evaluations in which they found an individual to meet the SVP criteria: 7–8 percent for Dr. Musacco, 10 percent for Dr. Sims and Dr. King, 10–15 percent for Dr. Owen, 15–20 percent for Dr. Fisher, and 20 percent for Dr. Patterson. Dr. Owen was squarely in the middle of that range. On this record, it is not reasonably probable that the verdict would have been more favorable to Stokes if testimony about Dr. Owen's annual compensation had been adduced.

In sum, we conclude that the trial court acted within its discretion in sustaining the objection to the question on Dr. Owen's annual compensation and that even assuming error, any such error was harmless.[8]

### DISPOSITION

The judgment is affirmed.

---

[8] Having rejected each of Stokes's claims regarding individual error, we need not address his further argument that the cumulative effect of these errors deprived him of due process and a fair trial.

22

_____
Van Aken, J.*


We concur:


_____
Stewart, P.J.


_____
Miller, J.


*People v. Stokes* (A160194)


&ast; Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.